# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| **NEXUS SERVICES, INC.,**<br>**MICHEAL DONOVAN, and**<br>**RICHARD MOORE,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civ. Action No.** 5:16CV00035 |
| **DONALD LEE MORAN, in his**<br>**Individual capacity and in his Official**<br>**Capacity as a Deputy Sheriff of Augusta**<br>**County, Virginia** | ) ) ) ) ) | |
| **DAVID L. BOURNE, in his Individual**<br>**capacity,** | ) ) ) | |
| **WANDA JEAN SHREWSBURY, in her**<br>**Individual capacity and in her Official**<br>**Capacity as Commissioner of the**<br>**Revenue of Augusta County, Virginia** | ) ) ) ) ) | |
| **GENE R. ERGENBRIGHT, in his**<br>**Individual capacity and in his Official**<br>**Capacity as a Business Tax Auditor for**<br>**Augusta County, Virginia** | ) ) ) ) ) | |
| **DONALD L. SMITH, in his Individual**<br>**capacity and in his Official capacity as**<br>**Sheriff of Augusta County, Virginia** | ) ) ) ) | |
| **MICHAEL ROANE, in his Individual**<br>**capacity and in his Official capacity as a**<br>**Deputy Sheriff of Augusta County,** | ) ) ) | |

| | |
|---|---|
| **Virginia** | ) |
| | ) |
| **And** | ) |
| | ) |
| **JOHN DOES 1-20,** | ) |
| | ) |
| **DEFENDANTS.** | ) |
| _____ | ) |

## <u>COMPLAINT</u>

## I.    <u>PRELIMINARY STATEMENT</u>

This case concerns a for-profit bail bondsman who conspired with a former employee now serving as a Deputy Sheriff in Augusta County, Virginia, and others to halt the nation's most successful charitable criminal bonding program. The civil conspiracy was intended to and did cause injury to the business operations and reputation of the financial backers of the charitable criminal bonding program through a campaign of misinformation disseminated in emails and the misuse of government resources to provoke a misguided government investigation and a pattern of abusive behavior of police officers and tax officials all in violation of Virginia and federal law.

A series of startlingly frank emails reveal that in order to halt a perceived threat to the for-profit bonding program, the Defendants mounted a campaign of fear, misinformation, conjecture and physical intimidation. This campaign caused other local elected and appointed government officials and law enforcement

officers to open and then vigorously pursue a modern day witch hunt of the individual Plaintiffs, who are founders of the charitable bonding program.

## II.  PLAINTIFFS, DEFENDANTS AND RELEVANT THIRD PARTIES

1.  Plaintiff NEXUS Services, Inc. is a corporation organized and existing under the laws of the Commonwealth of Virginia. Its principal place of business is in the County of Augusta, Virginia.  It is the holding company for the Nexus family of companies, which includes, among others, LIBRE by Nexus, Inc. (which assists detainees in federal immigration proceedings in procuring bonds) and NEXUS Caridades, Inc. (which provides free legal services to persons who are detained in immigration proceedings).  Over seventy percent (70%) of the employees of the Nexus family of companies who work in Augusta County, Virginia are non-Caucasian individuals, over ninety percent (90%) of the clients served by LIBRE by Nexus and NEXUS Caridades are non-Caucasian individuals, and approximately sixty percent (60%) of the beneficiaries of the charitable bonding program by Nexus in Augusta County, Virginia are non-Caucasian individuals.

2.  Plaintiff Micheal Donovan ("Donovan") is an individual who resides in the County of Augusta, Virginia.  He is the President and CEO of Nexus Services, Inc.

3.  Plaintiff Richard Moore ("Moore") is an individual who resides in the County of Augusta, Virginia.  He is the Executive Vice-President of Nexus Services, Inc.

4.  Defendant Donald L. Moran ("Moran") is an individual who resides in the County of Augusta, Virginia.  He is currently employed as a Deputy Sheriff by the Augusta County Sheriff's Office and previously served as an employee or agent of Defendant Bourne.  Deputy Moran may be served at his place of business at the Augusta County Sheriff's Office, 127 Lee Hwy., Verona, VA 24482.

5.  Defendant David L. Bourne ("Bourne") is an individual who resides in the County of Augusta, Virginia.  He is a licensed bail bondsman in the Commonwealth of Virginia, and a general agent for, among others, Lexington National Insurance Company. Upon information and belief, the vast majority of for-profit criminal bonds that are written for persons detained for suspected crimes in Augusta County, Virginia, are written by Defendant Bourne or persons acting under his direction and control.  Defendant Bourne may be served at 333 Baldwin Lane, Staunton, VA 24401.

6.   Defendant Jean Shrewsbury ("Shrewsbury") is the elected Commissioner of the Revenue for Augusta County, Virginia. She supervises Business Tax Auditors Joy Mauzy and Gene R. Ergenbright. Defendant Shrewsbury can be served at her place of business at the Augusta County Government Center, 18 Government Center Lane, Verona, VA 24482.

7.   Defendant Gene R. Ergenbright ("Ergenbright") is an individual who resides in the County of Augusta, Virginia, and may be served at his place of business in Augusta, County at the Augusta County Government Center, 18 Government Center Lane, Verona, Virginia 24482.  At all times material to this Complaint, Defendant Ergenbright was employed as a Business Tax Auditor for Augusta County and the City of Harrisonburg.

8.   Defendant Donald L. Smith ("Smith") is an individual who resides in the County of Augusta, Virginia.  He has been employed as the elected Sheriff of Augusta County, Virginia since January 2016. Defendant Smith may be served at his place of business in Augusta County, Virginia at the Augusta County Sheriff's Office, 127 Lee Hwy., Verona, Virginia 24482. Defendant Smith supervises Defendants Moran and Roane as well as Captain Spence, Corporal Young and others within the Augusta County, Virginia Sheriff's Office.

9.   Defendant Michael Roane ("Roane") is an individual who serves as a Deputy Sheriff in the Augusta County, Virginia Sheriff's Office. Defendant Roane may be served at his place of business in Augusta County, Virginia at the Augusta County Sheriff's Office, 127 Lee Hwy, Verona, Virginia 24482.

10.  John Does 1-20 (hereinafter "Does") include, but are not limited to, employees of, or persons acting at their direction or control, the Augusta County Sheriff's Office, Middle River Regional Jail Correctional Employees, Private Surety Business Employees, Commissioner of the Revenue Employees, Augusta County Governmental Employees, City of Harrisonburg Governmental Employees and other individuals who separately and together conspired with the named Defendants to injure Plaintiffs' business and/or to deprive Plaintiffs of their Constitutional rights.

11.  Lexington National Insurance Company ("Lexington") is a corporation organized and existing under the laws of Maryland.  Its principal place of business is in the city of Baltimore, Maryland.  It is in the business of providing bail bond surety for a fee.  Lexington regularly transacts business in the Commonwealth of Virginia and specifically in the County of Augusta through its agent, Bourne.

6

12. Timothy Martin ("Martin") is an individual who resides in the County of Augusta, Virginia. He is employed as the elected Commonwealth's Attorney of Augusta County.

13. Jack Lee ("Lee") is an individual who resides in the County of Augusta, Virginia. He is the Superintendent of Middle River Regional Jail, located in Augusta County, Virginia.

14. Joy Mauzy ("Mauzy") is an individual who resides in the County of Augusta, Virginia. She is employed as a Tax Auditor for Augusta County.

15. Eric Young ("Young") is an individual who resides in the County of Augusta, Virginia. He is employed as a Deputy Sheriff by the Augusta County Sheriff's Office.

16. William D. Spence ("Spence") is an individual who resides in Augusta County, Virginia and at all times material to this Complaint served as a Captain in the Augusta County Sheriff's Office.

### III.   NATURE OF ACTION

17. This is a civil action under 42 U.S.C. § 1983 seeking damages and injunctive relief against Defendants Moran, Smith, Roane, Ergenbright, Shrewsbury and the John Doe Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiffs of rights secured under

the First Amendment of the United States Constitution; specifically the infringement of Plaintiffs' freedom of speech.

18.  This is a civil action under 42 U.S.C. § 1983 seeking damages and injunctive relief against Defendants Moran, Smith, Roane and the John Doe Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiffs of rights secured under the First Amendment of the United States Constitution; specifically the infringement of Plaintiffs' exercise of their constitutionally protected petition rights.

19. This is a civil action under 42 U.S.C. § 1983 by Plaintiffs Moore and Donovan seeking damages and injunctive relief against Defendants Moran, Smith, Roane and the John Doe Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff Nexus Services of rights secured under the Fourth Amendment of the United States Constitution; specifically the right to be secure from unreasonable searches and seizures.

20. This is a defamation claim (under Virginia common law) and a statutory insulting words' claim (pursuant to Virginia Code § 8.01-45) the Plaintiffs against Defendant Bourne for communications disseminated by Bourne concerning Plaintiffs.

21. This is a civil action by the Plaintiffs under Virginia Code § 18.2-499 and 500 for civil conspiracy against all Defendants.

22. This is a civil action under Virginia Code § 8.01-45 by the Plaintiffs against Defendant Bourne for insulting words intended to lead to violence and breach of peace.

## IV.   <u>JURISDICTION AND VENUE</u>

23. The majority of the relevant conduct giving rise to the causes of action herein set forth occurred in the County of Augusta, Virginia, and all named defendants live and/or work in Augusta County, Virginia.

24. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331. This Court has subject matter jurisdiction over all non-federal claims in this action pursuant to 28 U.S.C. § 1367(a).

25. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claim occurred.

## V.   <u>FACTS COMMON TO ALL COUNTS</u>

26. This case concerns a for-profit bail bondsman who conspired with a former employee now serving as a Deputy Sheriff in Augusta County, Virginia, and others, to halt the nation's most successful charitable bonding program.

27. Defendant Bourne is a licensed bail bondsman in the State of Virginia and a general agent for, among others, Lexington National Insurance Company, which provides criminal bail bond sureties for a fee.

28. Prior to working as a Deputy Sheriff, Defendant Moran was an "agent" for, and reported to, David Bourne. In his capacity as a Deputy Sheriff, Defendant Moran serves on a task force that is comprised of state, federal and local law enforcement officials, including the Federal Bureau of Investigation.

29. Donald Smith was recently elected to the position of Sheriff of Augusta County, Virginia, and he assumed office in January 2016.

30. Plaintiffs Donovan and Moore are civil rights leaders, philanthropists and entrepreneurs who live and work in Augusta County, Virginia. They are an openly gay couple who founded a series of for-profit and not-for profit companies designed to provide alternatives to incarceration for people who are accused of committing a crime, but who have not been convicted of a crime, to provide access to justice for people who can't afford lawyers or bail, and to support and uplift people struggling to overcome poverty and prejudice. The business model was inspired by the couple's experiences of being convicted of non-violent criminal offenses some of which occurred

several years ago, and most over a decade ago. Since 2013, Donovan and Moore have founded a family of companies and launched ground breaking charitable services:

a. Nexus Services Inc. is the holding company for the Nexus family of companies.

b. Libre by Nexus Inc. is the largest and most successful for-profit bond securitization program for persons detained in immigration proceedings in the United States. Unlike criminal proceedings, detainees in immigration matters are required to post 100% of the bond that is set, which can exceed $25,000. The size of the bond in immigration proceedings meant most people detained could not post bond because they lacked sufficient cash or full collateral. Libre transformed the immigration bond industry by providing a comprehensive support system that included, among other things, language translation services, counseling, and personal GPS equipment, which allowed detainees or their families to secure bonds by participating in a monitoring program. According to reports, one half of the immigration detainees who receive bond today are a Libre client. Libre's support system has proved so successful that it enjoys

the lowest rate of bond failures in the industry — less than 2%. The commercial success of Libre allowed Donovan and Moore, through various not for profit companies and community outreach programs, to give back to their country and to their community.

c. Nexus Caridades is a not-for-profit entity backed by the founders of Libre, which provides free legal services to persons detained while awaiting immigration proceedings. Caridades is now one of the largest providers of free legal services for persons facing immigration proceedings in the United States and recently expanded its free legal services to persons awaiting criminal proceedings.

d. In December 2013, Libre launched its "Christmas Miracle" program, providing gifts for local families in need in the Central Shenandoah Valley of Virginia, and in 2015 Libre launched a home "give away" program for a deserving local family that was patterned after the Habitat for Humanity program.

e. Since 2014, Libre and Nexus Services, Inc. have awarded $700,000.00 in scholarship aid to local high school students from Harrisonburg, Augusta, and Rockingham Counties, Virginia.

f. In 2016, Donovan launched "Breaking Through," a community affairs program on local television and radio stations designed to highlight news and information in the Harrisonburg, Augusta, and Rockingham County areas with a special emphasis on the rights of minorities, women, refugees, the LGBT community, and persons detained, charged or convicted of a crime.

g. Beginning in 2015, Donovan and Moore launched a charitable criminal bonding program designed to secure bonds for any individual who was awaiting a criminal trial in Harrisonburg, Augusta, and Rockingham Counties, who qualified for a bond, but who remained incarcerated because he or she could not afford to post a bond. Donovan and Moore were concerned about the local jail overcrowding because while the counties' population was overwhelmingly Caucasian (Augusta County is 93.7% Caucasian), an overwhelming percentage of the persons detained for inability to post bond were African American or Hispanic.

h. Beginning in early 2016, Nexus began running advertisements on local radio and television programs advertising the free bonding program, which has grown to become the largest privately funded

charitable bonding program in the United States. ***It was this last charitable endeavor, <u>perceived by Defendant Bourne to be a threat to his business</u> that prompted the Defendants to conspire to disrupt the free bonding program by a campaign to damage the reputations of Donovan and Moore and disrupt the Nexus family of company operations.***

31. On Thursday, January 28, 2016, at 10:44 AM Defendant Bourne sent an email to the President of Lexington National and other executives of the insurance company complaining about the charitable bonding program being offered by Nexus.[1] Bourne's email noted that "[o]ver the weekend, Nexus made an appearance at the Middle River Regional Jail (MRRJ) located in Augusta County, which is where our office is located." The email went on to state that two persons were bonded out, with fees being paid by Nexus and stated, though "[w]e had been working with both clients on trying to get 7% down." The email stated that Bourne provided documentation regarding the free bonds as well as the "background element on Mike Donovan and Richard Moore" to "***Deputy Don Moran, assigned to the FBI task force,***

---

[1] The email was obtained pursuant to a FOIA request sent to the county.

*also a former agent of ours.*" [Emphasis added.] See Exhibit A attached hereto.

32. In the January 28, 2016 Bourne email to Lexington National, Bourne admitted that although he at first suspected that Nexus was bonding individuals out of jail so that they could pay "an enormous fee for the bond on an installment plan" he admitted he was "totally off base" because Nexus was providing the bonding at no cost. Bourne then speculates that there must be a "return" for a charitable investment by Nexus to include money laundering, expansion of a federal pre-trial release program or an effort to expand the use of electronic monitors throughout the country for defendants released on bond. Bourne then reveals his own economic self-interest: *"This whole thing smells real bad and could take our business down the drain really fast….We are now getting phone calls where the caller is asking if we are the company that gets people out [of jail] for free. Nexus has a new ad running on television (trying to get a copy) indicating 'if you don't have the money for bail call us.' The word is spreading quickly."* [Emphasis added.] See Exhibit A attached hereto.

33. In the January 28, 2016 Bourne email to Lexington National, Bourne makes clear that he, Bourne, has already attempted to sully the reputation of the

founders of Nexus and has used and intended to use background investigative tools to sully the reputation of a third executive of the company: "The Sheriff has been made aware of Donovan's criminal history and provided the proof. There are eleven felony convictions on him and with that kind of record in his past, there is most likely fraudulent activity going on. I haven't seen much of Richard Moore. There is a new guy on the ads which goes by the name of Evan Ajin, Vice president. **I don't have his [Ajin's] vitals 'yet' so I can't get his records at this time.**" [Emphasis added.] See Exhibit A attached hereto.

34. Bourne closes his January 28, 2016 email to Lexington National executives by warning: "**None of us can compete with free bail, and the results of free bail, will hurt us all in the end.**" [Emphasis added.] See Exhibit A attached hereto.

35. At 4:50 PM on January 28, 2016, Defendant Bourne forwarded the email to Lexington National to his friend and former agent Defendant Moran stating: "Don, Please see the preceding email which may offer you some insight on Nexus. I rafted [sic] this to open discussions with the guys in Baltimore and thought you might want to read it as well." See Exhibit A attached hereto.

36. At 5:23 PM on January 28, 2016, Defendant Bourne sent another email to Defendant Moran forwarding a link to the Christmas Miracle program launched by Nexus.  Defendant Bourne speculates in the memo:  "Turns out that the home they give away isn't actually given away. They only give it to them for 4 years rent free. Could someone then deposit dirty money into an account and claim it as rental income to clean the money up?" See Exhibit B attached hereto.[2]

37. On January 29, 2016, Defendant Bourne sent another email to Deputy Sheriff Moran forwarding links to two newspaper articles. The first article did not relate to Nexus. Defendant Bourne notes in the email that the second article indicated that Nexus made a profit from its immigration bail program that utilized electronic monitors. Bourne points out, however, that "ICE [US Immigration Officials] states that it is **perfectly legal** to put them [immigration detainees] on monitors…." [Emphasis added.] See Exhibit C attached hereto.

---

[2]   The Home Give away program was patterned after the Habitat for Humanity home give away program, which requires a period of time to pass before the home's inhabitants can take full title to properties due to a concern for the recipient's ability to initially manage home ownership and the possibility of third parties taking advantage of the new home owner.

38. On February 5, 2016, Defendant Bourne forwarded a *2012* news story about Nexus by a Harrisburg news outlet to Deputy Sheriff Moran. The forwarded article, located at **http://www.whsv.com/home/headlines/GPS-Bracelets-Allow--163777136.html** bore the headline "GPS Bracelets Could Help Jail Overcrowding and Save Tax Money." See Exhibit D attached hereto. The article quotes Micheal Donovan in the second paragraph as saying if an inmate cannot afford to pay bond, Nexus will cover the fee as long as the defendant will wear a GPS device. The article also quotes Donovan *in 2012* as stating that if an inmate can afford to pay, the inmate would bear the cost of the monitoring of approximately $11 day so there would be no burden on the taxpayers. The Rockingham County Sheriff is quoted in the 2012 article as stating it is not something that his department planned to implement.

39. Defendant Moran responded to Defendant Bourne's February 5, 2016 email stating that "seems their [sic] using the gps to off set not paying the fee." See Exhibit E attached hereto. Defendant Bourne's reply runs the math to calculate the potential financial gain to Nexus if the bracelet monitoring program was adopted in his area: "Yeah like I said a felony case averages about 16 months before a final disposition. That's almost $8,000." See Exhibit E attached hereto.

40. Upon information and belief, Defendant Bourne distributed the <u>2012</u> article to others in Augusta County's government in an effort to create confusion about the <u>2016</u> charitable bonding program. Defendant Bourne knew, but did not disclose, that the 2016 charitable bonding program did not charge fees for services.

41. Also on February 5, 2016, at roughly the same time that Defendants Moran and Bourne were having an email discussion about the Harrisburg news article forwarded by Defendant Bourne, the director of the Blue Ridge pretrial services program, David Pastors, forwarded ***the same 2012 news article link*** about Nexus to the Commonwealth Attorney for the area, Timothy Martin and the Assistant Commonwealth Attorney Alexandra Meador.  The subject matter of Pastors email concerns a case involving J.D., an incarcerated 18-year old non-Caucasian high school student who spoke little or no English who was accused of rape and was being held without bond. The individual defendant was then represented, *pro bono,* by Nexus Caridades attorneys. See Exhibit F attached hereto.

42. Though it had no bearing on the guilt or innocence of J.D. or the competency of the Caridades legal team, the Pastors' email warns Mr.

Martin and Ms. Meador that the Caridades legal team cannot be trusted because they are associated with Nexus. See Exhibit F attached hereto.[3]

43. As the bond hearing date for J.D. approached, so too did the local government's scrutiny of Nexus, fueled by emails and contacts by Defendants Bourne and Moran. On February 10, 2016, Defendant Bourne sent an email to Commonwealth Attorney Martin (whom he addressed as "Tim") stating: "Below are several links about Nexus. As I said the President is Micheal Donovan and the Executive Vice President is Richard Moore. Both are convicted felons multiple times and *they are running a scam* on the communities of Harrisonburg, Rockingham, Staunton, Waynesboro and Augusta County and I fear that other locations are soon to come…I would prefer that you get the criminal history stuff from Don Moran at ACSO 540-457-9928. I printed all the dispositions but I'm sure that the most accurate records are what he pulled. Make sure you take an hour and watch the 2 episodes of Breaking Through at the bottom of the list. That will give you a clear picture of what they are trying to achieve. Keep in mind when you are watching that these are con men and wicked smart. They

---

[3] Mr. Pastors' email erroneously states that Mr. Donovan had been a bail bondsman and that his license had been revoked. Mr. Donovan has never been a licensed bondsman and could never have had his license revoked.

make themselves out to be pillars of the community with all the stuff they give away but read the fine print. One question to ask is, where does the money come from?"  [Emphasis added.] See Exhibit G attached hereto.

44. Remarkably, even though Defendant Bourne had specifically informed the Lexington National executive team in writing  on January 28, 2016, that he verified that Nexus was not, in fact, charging any fees for its free criminal bail bond program, Defendant Bourne knowingly provided false information by advising the Commonwealth Attorney Martin that Nexus *was* charging a fee for its free criminal bonding program, citing a 2012 article:  "They [Nexus] will use free bail as the hook with an agreement that the defendant wear and pay for an electronic monitor at $11.00 per day. The average life of most case [sic] is about 12 months. $11.00 per day x 365 is $4,015. *Please see my illustration below as compared to the bail bond itself. There is certainly a place for them in some cases but electronic monitors should only be used when it is mandated by the court. Otherwise it becomes a form of extortion by making the defendant pay $420 per month under threat of being returned to jail."*  [Emphasis added.]  See Exhibit G attached hereto.

45.  As set forth in Exhibit C, Defendant Bourne knew, but failed to disclose to
     Mr. Martin, that the use of GPS equipment by Libre by Nexus in the
     immigration context had been determined to be "perfectly legal" by U.S.
     Immigration officials. Also as set forth in Exhibit A, Defendant Bourne
     knew, but failed to disclose to Mr. Martin, that Nexus did not charge for the
     bonds extended to individuals in the charitable criminal bonding program
     and did not require recipients of the charitable criminal bonds to wear GPS
     equipment.

46.  Between February 10, 2016, and April 24, 2016, Defendant Moran
     approached two employees of Nexus and identified himself as an F.B.I.
     agent. Defendant Moran asked the Nexus employees to assist him in an
     investigation of Nexus. Upon information and belief Defendant Moran told
     both employees that he had no evidence of any criminal wrong doing by
     Nexus and needed help finding it. Nexus discovered the contact with Nexus
     employees as a result of an internal investigation. Defendant Moran's
     conduct harmed the company by damaging the reputation amongst their
     employees as well as the loss of an employee.

47.  On Monday, February 15, 2016, Defendant Bourne forwarded to the
     Augusta County Commonwealth's Attorney Tim Martin, a link to the Nexus

television show (Breaking Through), Episode 3. Bourne warned Mr. Martin: "Looks like they [Plaintiffs] are going after MRRJ [Middle River Regional Jail] over the next three weeks." See Exhibit H attached hereto.

48. Also on Monday, February 15, 2016, Defendant Bourne forwarded the Breaking Through, Episode 3 link to Jack Lee, the Jail Superintendent for MRRJ. See Exhibit I attached hereto.  Mr. Lee, in turn forwarded Mr. Bourne's email to Steve Owen, the City Manager for the City of Staunton, Virginia, with the message:  "Hey Boss, [w]hen you get a chance and a little time watch the 3 episodes attached. ***This group [Nexus] needs to be watched closely. They could be recklessly dangerous to the whole criminal justice system.***"  [Emphasis Added.] See Exhibit J attached hereto.

49. Later in the evening of February 15, 2016, Defendant Bourne's email was forwarded by Mr. Lee to most of the leadership of the MRRJ and to Eric Young, a corporal with the Augusta County Sheriff's Office.  See Exhibit K attached hereto. Significantly, the MRRJ is the facility that is being used to house the Nexus Caridades Client, J.D.  Corporal Young is an officer who has been assigned to the J.D. case.  Corporal Young has also personally visited the home of Micheal Donovan on two occasions to request that private security guards retained by Mr. Donovan provide their identification

information to him.[4] On one of those occasions Corporal Young identified himself as working for the FBI in an attempt to gather personal information of security personnel.

50. On or about February 18, 2016, Erik Schneider, Director of Risk Management for Nexus, and other representatives of Nexus visited with Sheriff Smith, the newly elected Sheriff of Augusta County, Virginia, to report the employee contacts by Defendant Moran, and to complain that Defendant Moran had held himself out as an F.B.I. agent conducting an investigation of Nexus, which damaged the reputation of Nexus. Furthermore, Defendant Moran's conduct caused significant emotional distress to other Nexus employees. Defendant Smith thanked Mr. Schneider and apologized for Defendant Moran's conduct. Defendant Smith assured Mr. Schneider that he would put an immediate stop Defendant Moran's conduct.

51. Unfortunately, contrary to Defendant Smith's statements to Mr. Schneider, upon information and belief, Defendant Smith did nothing to curb Defendant Moran's actions on behalf of his former boss, Defendant Bourne. Law

---

[4] Fearing for his safety and the safety of his employees as a result of the activities of Deputy Sheriff Moran, Mr. Donovan retained private security for the officers of Nexus.

enforcement officials within the Sheriff's Office responded to Mr. Schneider's visit by pulling DMV driving records (multiple times in the same week) for various Nexus employees.

52. On February 19, 2016, Plaintiff Donovan invited Defendant Smith to his corporate offices to discuss the mission of the Nexus family of companies. Defendant Smith arrived with his Chief, Captain William D. Spence. Attending the meeting with Defendant Smith and Captain Spence was, among others, the General Counsel for Nexus, Gordon Turner. Mr. Turner is an African American attorney. Mr. Turner explained to Sheriff Smith and Captain Spence that Nexus planned a series of educational events between the immigrant community and law enforcement to assist immigrants from Mexico and Central America in understanding cultural norms in the United States. Mr. Turner, who has lived in Mexico and Central America, stated that in those cultures (unlike most of the U.S.) it would not be uncommon for youth and adults to carry machetes with them to cut foliage or fruit or to obtain coconuts from trees. In response, Capt. Spence asked Mr. Turner if he (Turner) could climb coconut trees and proceeded to flap his arms and make "monkey" sounds. The racially charged remarks and insulting pantomime by Capt. Spence were made in the presence of Sheriff Smith, who did nothing

to reprimand Capt. Spence or apologize to Mr. Turner for his subordinate's conduct.

53. As the investigation stirred by Defendants Bourne and Moran intensified against the principals of Nexus in mid-February 2016, so too did the investigation of the attorneys for the Nexus Caridades Client, J.D.

54. The bond hearing for J.D. began on February 11, 2016, but had to be continued mid-hearing to February 25, 2016. On February 25, 2016, Detective Mike Roane with the Augusta County Sheriff's Office forwarded a Word document to Defendant Moran at donald.moran@ic.fbi.gov and copied Sheriff Smith and Captain William Spence of the Augusta County Sheriff's Office. The email stated that it attached a document regarding "Events of 2-25-16."  The report of Detective Roane submitted to Defendant Moran is attached as Exhibit L attached hereto. Detective Roane stated that he was assigned to the investigation of the Nexus Caridades' Client and he was asked by the Commonwealth Attorney Martin to surveil the bond hearing: "I arrived at the courthouse at approximately 0900 hours. As I entered the upstairs portion of the building, I observed several (approximately 15-20) **Hispanic decent** persons waiting directly outside the court room. I entered the room and was positioned in the front row. A few

26

minutes later, the proceedings began. All of the persons that were waiting outside, appeared in in the courtroom and took a seat on the left side of the gallery." See Exhibit L attached hereto. [Emphasis Added.]

55. Detective Roane continued his memo of February 25, 2016, admitting that he was familiar with Defendant Moran's investigation of Nexus and that Nexus "is the same company that has employed [J.D.'s] attorney. ***Based on my limited knowledge, I took several photographs of the persons in the courtroom and forwarded them via text to Inv. Moran. We exchanged a few text messages. Inv. Moran encouraged me to take as many photographs as possible to assist in his investigation. I then contacted Lt. Leveck via text and requested that he and other Investigators respond to the Wharf parking lot in a covert manner. I requested that they observe the group and photograph vehicles and tags to assist Inv. Moran."*** [Emphasis added.] See Exhibit L attached hereto. Upon information and belief, the photographing of persons in a courtroom in cases involving alleged sexual crimes is strictly forbidden by Virginia law.

56. As he was leaving the courtroom on February 25, 2016, Detective Roane was approached by an investigator for the defense team, Eric Schneider, who introduced himself to Detective Roane, and asked for his name. Detective

27

Roane refused to tell the defense investigator his name. In his report, Detective Roane stated that after his encounter with the defense investigator, he (Roane) "went into the building across the street and photographed the male that I had just encountered. I called Inv. Moran via phone and explained what had just occurred." Detective Roane stated that the photographs taken in the courtroom bond hearing and of the attorneys leaving the hearing were forwarded to "Inv. Moran." See Exhibit L attached hereto.

57. The case involving J.D., an 18-year old high school student, concerns allegations of an acquaintance rape, based on intoxication.  It is neither a gang case, nor a drug case.  There was no legitimate reason to photograph the individuals attending the hearing, or the legal team (which included Mr. Turner), nor was there any reason to take down the license plates of the vehicles belonging to those persons.

58. Bond was denied for J.D. during the hearing of February 25, 2016. When the Commonwealth Attorney was congratulated in an email on his performance during the bond hearing by Debbie Walker, a pre-trial program manager for Blue Ridge Court Services (the entity that was forwarded information by David Bourne just a few weeks earlier), Commonwealth Attorney Tim

Martin responded: "I really can't stand these people [Nexus] and have no clue where the money comes from."  See Exhibit M attached hereto.

59. After the bond hearing on February 25, 2016, Mr. Schneider visited the Sheriff's office to register a complaint with the Sheriff that Detective Roane refused to identify himself at the courthouse when asked for his identity. Mr. Schneider met with Sheriff Smith and Capt. Spence. In the presence of Sheriff Smith, Capt. Spence told Mr. Schneider that investigating Spence or any other law enforcement officer was 'a good way to get yourself shot.' When Mr. Schneider expressed alarm, Capt. Spence stated that he did not mean that he intended to shoot Mr. Schneider, but that investigating law enforcement officers was 'not something [Schneider] wanted to be doing.'

60. On March 7, 2016, Chief Government Affairs Officer for Nexus, Rick Nagel, requested a meeting with Commonwealth Attorney Martin. Mr. Nagel was attempting to defuse what was obviously an unprofessional level of animosity and antagonism displayed by Defendant Moran and his colleagues in the Sheriff's Office against Nexus and its clients. Mr. Martin's assistant, Patty Campbell, sent an email to Mr. Martin requesting a meeting by Nexus. Mr. Martin immediately forwarded Ms. Campbell's email <u>to</u> <u>Defendant Moran</u> with the message: ***"FYI.  Thoughts? I have told Patty she***

*can feel free to schedule this sort of thing, but I am not at all interested in meeting this guy."* [Emphasis added.] Exhibit N attached hereto.

61. Also on March 7, 2016, Defendant Moran (inexplicably referring to himself in the third person) sent an email to his *boss*, Sheriff Smith, requesting that Sheriff Smith prepare a report of Sheriff Smith's contact with Erik Schneider on February 18, 2016: "**Hey, Can you do a report for the Event when Nexus came to the office to talk about Don Moran. Thanks, I know your [sic] busy. We are going to the US Attorneys office in Roanoke tomorrow to discuss the case. Hopefully we will get good news. I'll keep you posted. Thanks, Don.**" [Emphasis Added] Exhibit O attached hereto.

62. Apparently, Defendant Moran's looming visit with the U.S. Attorney's office in Roanoke prompted a burst of investigative efforts by his county colleagues. Also on March 7, 2016, Augusta County elected Commissioner of the Revenue Jean Shrewsbury contacted Nexus and demanded to walk through the corporate campus on that same day.

63. Ms. Shrewsbury brought with her Business Tax Auditors Joy Mauzy and Gene R. Ergenbright to the meeting on March 7, 2016, and, as Shrewsbury demanded, Donovan gave them a complete tour of the Nexus corporate campus.

64. At the time of the March 7, 2016 visit to the Nexus campus, Mr. Donovan
    had explained that Nexus attempts to assist immigrants who are seeking
    refuge for, among other reasons, death threats associated with their sexual
    orientation. Mr. Donovan noted that gangs in Africa and El Salvador were
    exterminating men who they believed were homosexuals, much like Hitler
    did during the atrocities that led up to and continued during World War II.
    Mr. Donovan noted that these atrocities culminated in the Nazi Party's
    "Final Solution," which resulted in the mass extermination of millions of
    innocent people. Mr. Donovan also advised the group that Mr. Moore and
    General Counsel Gordon Turner had recently visited El Salvador in Central
    America, where they were investigating the feasibility of placing a call
    center.  Donovan explained that many of the immigration clients that Libre
    by Nexus served sought asylum in the U.S. because they were attempting to
    flee gang violence in El Salvador. Not all who apply for asylum can or will
    be approved to stay in the United States. Libre hoped that by building a call
    center its clients who were ultimately deported could return to potential
    employment and (hopefully) a better, safer lifestyle. Following the March 7,
    2016 visit to Nexus, Ms. Mauzy wrote to Donovan to thank him for the visit.
    The tone of the email was cheerful and friendly, and Ms. Mauzy ended her

email by stating "we are so happy to have Nexus in Augusta County!!".  See
Exhibit P attached hereto.

65. Unfortunately, Ms. Mauzy's subsequent communications with her tax
auditor colleagues about Nexus were less than welcoming.

66. On March 8, 2016, Ms. Mauzy and part-time Augusta County Business Tax
Auditor Gene R. Ergenbright exchanged a chilling series of emails about
Nexus and Mr. Moore's trip to El Salvador. Ms. Mauzy wrote: 
"…you might want to consider El Salvador [for retirement]
and I know someone you can go with!!!" In response to Ms. Mauzy's email,
Mr. Ergenbright stated: "…If he's in El Salvadore I want to be in Alaska."
Attached to this email exchange were Hitler emojis. See Exhibit Q attached
hereto and image inserted herein.   At this same time, Ms. Mauzy and Mr.
Ergenbright were communicating by email to Commissioner of the Revenue
Jean Shrewsbury, conspiring to use their authority to get information about
Nexus for improper purposes.

67. On April 20, 2016, two Special Conservator of the Peace (hereinafter
"SCOP") officers, and upon information and belief, with the knowledge and
at the direction of the Augusta County Sheriff's office, approached Plaintiff
Donovan's and Plaintiff Moore's personal shared residence. The SCOP

officers demanded that private security guards[5] at the Donovan/Moore residence provide identification and an explanation for why they were there.

68.   On April 20, 2016, a law enforcement official advised the private security guards at the Donovan/Moore residence that the Augusta County Sheriff would be paying more visits to the Donovan/Moore residence on future occasions.

69.   On April 21, 2016, two SCOP officers visited the Donovan/Moore residence and demanded Donovan explain the presence of the private security guards at the home.

70.   Also, on April 21, 2016, an individual identified as Corporal Young of the Augusta County Sheriff's Office visited the Donovan/Moore residence and inquired about the presence of the same security guard service.

71.   On April 23, 2016, Corporal Young visited the Donovan/Moore residence and demanded that the same security guard service again show identification.

72.   On April 25, 2016, an Augusta County Sheriff's cruiser slowly made two drive-by passes at the entrance of Nexus Services' corporate campus. The

---

[5] Fearing for his safety and the safety of his employees as a result of the activities of Deputy Sheriff Moran, Mr. Donovan retained private security for the officers of Nexus.

road beyond the campus is a dead end, and the police cruisers slowed each time while passing the campus' entrance.

73. On April 26, 2016, an Augusta County Sheriff's cruiser slowly made a drive-by pass in the cul-de-sac where the Donovan/Moore residence is located.

74. On May 1, 2016, an Augusta County Sheriff's cruiser slowly made two drive-by passes at the entrance of Nexus Services' corporate campus. The road beyond the campus is a dead end, and the police cruisers slowed each time while passing the campus' entrance.

75. On April 6, 2016, a representative of Nexus Services, Inc. sent a Freedom of Information Act (FOIA) request to Augusta County seeking all communications that referred to Nexus or its principals. See Exhibit R attached hereto. The County advised Nexus that it would produce the records on a usb drive a few weeks later. The above referenced Exhibits were contained on the usb drive in the documents produced by the County on April 22, 2016 in response to the FOIA request.

76. The usb drive produced to Nexus also contained many other documents that were not related to Nexus (including intelligence reports for the Virginia State police fusion center, investigation reports from state and federal

investigation agencies from ongoing and past investigations, social security numbers, dates of birth and other personally identifiable information for many other individuals including inmates housed in the Middle River Regional Jail since 2011).  After discovering the unrelated material on the usb drive, Nexus, through counsel, turned over the data to the United States Attorneys' Office in Roanoke, on Saturday, April 30, 2016. The U.S. Attorneys' office advised that it may notify the local authorities in Augusta County, Virginia of the inadvertent overbroad disclosure. Nexus wanted to ensure that any breaches of confidential or secure information be discovered and rectified immediately by proper authorities. Upon information and belief, the County's disclosure of certain information on the usb drive constituted violations of state and federal law.

77. On the evening of May 8, 2016, just one week after the U.S. Attorney's office advised that may alert Augusta County officials about the improper usb drive disclosures, the representatives of the Augusta County Sheriff's Office escalated physical intimidation efforts against Plaintiff Donovan. Detective Roane and another Augusta County Sheriff's Office employee, who could not then be identified, engaged in a dangerous display of brute force on the roadway when interacting with Micheal Donovan and his

security detail.  Following standard security service protocol, Donovan's security detail followed Donovan's car at a close distance when traveling on the highway. Defendant Roane in one vehicle and another marked Augusta County Sheriff's Office vehicle, made erratic driving moves to at first surround Donovan and his security detail and then to take extremely aggressive maneuvers to insert a car between Donovan's car and his security detail. Detective Roane then pulled alongside Donovan's car so that he could see who was confronting him. The point having been made, Detective Roane and his colleague departed at the next exit following the driving stunt.

78. On May 17, 2016 Micheal Donovan and Evan Ajin, Vice President of Operations for Nexus Services, went to Shrewsbury's office and delivered to her a letter dated May 16, 2016 addressing the Hitler emoji issue.  See Exhibit S, attached hereto.

79. Shortly after the May 16, 2016 letter regarding the embarrassing Hitler emoji was delivered to Shrewsbury, a news reporter with Breaking Through, (the Nexus-sponsored Community News Program), interviewed Shrewsbury at her office, regarding the emoji.

80. On May 18, 2016[6] at approximately 2:00 p.m., Corporal C. J. Deitz of the Augusta County Sheriff's Office, while wearing a Sheriff's Office uniform and driving a county vehicle, visited the Nexus' corporate campus and insisted on personally delivering a document to Micheal Donovan, Richard Moore or David Briggman (Director of Special Operations for Nexus).  See Exhibit T, attached hereto. The use of a uniformed officer of the Sheriff's Office to deliver a letter to Nexus employees at the Nexus campus was not appropriate and was intended to and did cause fear and intimidation for employees of Nexus. Upon information and belief, the letter from the Augusta County Attorney was not valid service of process.

81. Said letter threatened criminal prosecution pursuant to Va. Code 58.1-3, unless Nexus returned to Augusta County the flash drive containing the embarrassing Hitler emoji and destroyed all copies, which would essentially require Nexus to destroy evidence of Shrewsbury's and other County Officials' unlawful acts[7].

---

[6]   Also on May 18, 2016, an officer working for or on behalf of the Augusta County Sheriff's officer parked outside of the home of Plaintiff's employee Mr. Eric Schneider and followed him when he left his residence for a considerable distance until he reached his corporate office.

[7]   As previously discussed, Nexus had already presented the data to the U.S. Attorney's office on April 30, 2016. Nexus had been instructed by state police

82. Va. Code § 58.1-3, which makes it unlawful to disseminate or publish confidential tax information, has no apparent applicability to the embarrassing Hitler emoji nor does it create any duty to return any items to Augusta County. The only apparent purpose of the May 18, 2016 letter and personal visit by Corporal Dietz was to continue the campaign of fear and intimidation against Plaintiffs, and to seek to cover up the Defendants' actions and obstruct justice by forcing Plaintiffs to destroy evidence of potential criminal acts committed by County officials.

83. On May 18, 2016, Plaintiffs filed suit against all named Defendants in state court in Augusta County, Virginia alleging violations of state law ["State Lawsuit."][8]

84. On the day of and following the filing of the State Lawsuit, representatives of the Augusta County, Virginia Sheriff's Office continued to visit the home of Plaintiffs Moore and Donovan and to drive by the corporate offices of the Plaintiffs in an effort to harass and intimidate Plaintiff. By way of example and without limitation, on May 28, 2016 (a Saturday on the Memorial

---

officers to retain evidence of the improper disclosures by the County as it opened an investigation of the matter.

[8] The State Lawsuit was nonsuited on June 2, 2016, and the claims contained therein were incorporated into the instant lawsuit to preserve judicial and litigant resources.

Weekend), two uniformed deputies of the Augusta County Sheriff's office in marked government cars made a rapid approach to the personal residence of Moore and Donovan in tactical formation and blocked the ingress and egress to their residence which constituted an unlawful detainment. The Deputies advised the Plaintiffs' personal security guards that their visit was simply to determine what type of car Mr. Donovan drove.

85.   At all times material to this Complaint: a) Defendants Smith and Shrewsbury had actual or constructive knowledge that their subordinates were engaged in conduct that posed a pervasive and unreasonable risk of harm to the constitutional rights of citizens like the Plaintiffs; b) Defendants Smith and Shrewsbury's response to the knowledge of their subordinates was so inadequate as to show deliberate indifference or tacit authorization of the offensive conduct of personnel under their control; and c) there was an affirmative link between Defendants Smith's and Shrewsbury's inactions and harm to the constitutional rights of the Plaintiffs.

86.   Detective Moran's actual knowledge of the contents of Exhibit A and his failure to disclose Defendant Bourne's improper commercial motives, and failure to disclose the lawful nature of Plaintiff's business as determined by Federal immigration authorities, constituted fabrication of evidence.

87. Detective Moran's failure to disclose the facts set forth in the preceding paragraph, coupled with his improper efforts to cause an unwarranted and unlawful investigation into Plaintiff's business, caused other Defendants including other named Defendants and John Does 1-20 to unlawfully detain Plaintiffs and to suppress Plaintiffs' First Amendment rights and cause other harm to Plaintiffs.

88. Defendants' actions caused economic and other harm to Plaintiffs, including but not limited to substantial costs for private security, fear for their safety and physical well being, damage to employee relationships, increased operational costs, and damage to their individual and corporate reputations.

## VI.   CAUSES OF ACTION

**A. Count I – Deprivation of Plaintiffs' Rights Under the First Amendment of the United States Constitution (the Free Speech Clause)**
*(Asserted by Plaintiffs Against Defendants Moran, Shrewsbury, Ergenbright, Smith and Roane and John Doe Defendants 1-20)*

85. The allegations contained in the preceding paragraphs are incorporated by reference as if fully set forth herein.

86. Political speech is entitled to robust protection under the First Amendment of the United States Constitution.

87. Plaintiffs' collective communications on Breaking Through constitute protected political speech under the First Amendment.

88. The First Amendment protects commercial speech from unwarranted government regulation or abridgment.

89. Nexus Services' Free Bonding Program Advertisements constitute protected commercial speech under the First Amendment.

90. The above-referenced adverse actions by Defendants Moran, Shrewsbury, Ergenbright, Smith, and Roane were taken against Plaintiffs in close temporal proximity subsequent to Plaintiffs' exercise of their free speech rights.

91. Defendants Moran, Shrewsbury, Ergenbright, Smith, Roane and John Doe Defendants 1-20 were each individually and collectively operating under the color of law when said Defendants took adverse actions against Plaintiffs.

92. Chilling Plaintiffs' protected speech was a substantial or motivating factor for Defendants Moran, Shrewsbury, Ergenbright, Smith, Roane and the John Doe Defendants' adverse actions against Plaintiffs.

93. The Plaintiffs' protected speech rights were in fact chilled by Defendants Moran, Shrewsbury, Ergenbright, Smith, Roane and the John Doe Defendants' adverse actions against the Plaintiffs.

41

94.  The activities of Defendants Moran, Shrewsbury, Ergenbright, Smith, Roane and John Does 1-20 constitute an effort to subdue and restrain Plaintiffs' ability to engage in constitutionally protected free speech in violation of the First Amendment of the United Stated Constitution.

95.  The activities of these Defendants caused harm to Plaintiffs.

96.  Plaintiffs are entitled to an award of nominal and/or compensatory damages, punitive damages, and attorneys' fees and expenses of litigation against these Defendants.

97.  Plaintiffs request that this Court enjoin these Defendants from further and additional infringement of their Constitutional rights.

   **B. Count II – Depravation of Plaintiffs' Rights Under the First Amendment of the United States Constitution (the Petition Clause)**
   *(Asserted by Plaintiffs Against Defendants Moran, Smith, Roane and John Doe Defendants 1-20)*

98.  The allegations contained in the preceding paragraphs are incorporated by reference as if fully set forth herein.

99.  The Petition Clause of the First Amendment protects the right of persons to appeal to courts and other forums established by the government for resolution of legal dispute.

100. Plaintiffs' State Court Lawsuit constituted a protected petition right under the First Amendment.

101. The above-referenced adverse actions by Defendants Moran, Smith, Roane, and John Doe Defendants 1-20 in increasing unwarranted and physically threatening police contacts with Plaintiffs were taken against Plaintiffs in close temporal proximity subsequent to Plaintiffs' exercise of their petition rights and such conduct was intended to and did cause harm to Plaintiffs' right to petition for protection of their First Amendment rights.

102. Defendants Moran, Smith, Roane, and John Doe Defendants 1-20 were each individually and collectively operating under the color of law when said Defendants took adverse actions against Plaintiffs.

103. Retaliation for Plaintiffs' engagement of their protected petition right was a substantial or motivating factor for Defendants Moran, Smith, Roane, and John Does 1-20's adverse actions against Plaintiffs.

104. Plaintiffs request that this Court enjoin the Defendants from further and additional conduct which would infringe upon Plaintiffs' First Amendment rights.

105. Plaintiffs are entitled to nominal and/or compensatory damages, punitive damages, attorneys' fees and expenses of litigation for Defendants' violation of their First Amendment rights.

**C. <u>Count III – Deprivation of Plaintiffs' Rights Under the Fourth Amendment of the United States Constitution (the Search and Seizure Clause)</u>**
*<u>(Asserted by Plaintiffs Moore and Donovan Against Defendants Moran, Smith, Roane, and John Does 1-20)</u>*

106. The allegations contained in the preceding paragraphs are incorporated by reference as if fully set forth herein.

107. The Fourth Amendment protects persons against unreasonable seizures.

108. When, on May 28, 2016, John Does in full uniform and driving government cars and while acting under color of state law blocked the driveway of the Donovan/Moore residence so as to prohibit ingress or egress without probable cause, it prohibited Moore and Donovan from leaving the residence without officer permission.

109. Defendants Moran, Smith, Roane, and John Does 1-20 constituted an unreasonable seizure under the Fourth Amendment.

110. Defendants Moran, Smith, Roane, and John Does 1-20 were each individually and collectively operating under the color of law when said Defendants took adverse actions against Plaintiffs.

111. The actions of Defendants Moran, Smith, Roane, and John Does 1-20 constitute are in violation of Plaintiffs' rights under the Fourth Amendment of the United States Constitution.

112. Defendants acted maliciously and with intent to cause harm to Plaintiffs.

113. Defendants' actions caused harm to Plaintiffs.

114. Plaintiffs request that this Court enjoin Defendants from further such conduct which would infringe upon Plaintiffs' Fourth Amendment rights.

115. Plaintiffs are entitled to nominal and/or compensatory damages, punitive damages, attorneys' fees and expenses of litigation.

### D. Count IV – Defamation (Under Virginia Common Law)
*(Asserted by Plaintiffs Against Defendant Bourne)*

116. The allegations contained in the preceding paragraphs are incorporated by reference as if fully set forth herein.

117. Bourne made various defamatory statements about Plaintiffs. These statements include conveying that Plaintiff's were: a) laundering money; b) con artists; c) running a scam; and d) engaged in extortion.

118. Bourne's defamatory statements were disseminated to third parties.

119. Bourne's defamatory statements were seen by persons other than Plaintiffs.

120. Bourne's defamatory statements were false.

121. Bourne made the statements knowing them to be false.

122. Bourne acted willfully and maliciously.

123. If Bourne believed the statements to be true, he lacked reasonable grounds for such belief, and acted negligently in failing to ascertain the facts on which the statements were based.

124. Plaintiffs were damaged as a result of Bourne's actions.

125. Plaintiffs are entitled to recover compensatory and punitive damages, costs and attorney's fees.

### E.  <u>Count V – Insulting Words Claim (pursuant to Virginia Code § 8.01-45)</u>
### <u>*(Asserted by Plaintiffs Against Defendant Bourne)*</u>

126. The allegations contained in the preceding paragraphs are incorporated by reference as if fully set forth herein.

127. The words of Defendants set out in the preceding count from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace.

128. Defendant Bourne's actions are actionable pursuant to Va. Code §8.01-45.

129. Plaintiffs were damaged as a result of Defendant's actions.

130. Plaintiffs are entitled to recover compensatory and punitive damages, costs and attorneys' fees.

### F.  <u>Count VI – Civil Conspiracy Claim</u>
### <u>*(Asserted by All Plaintiffs Against All Defendants)*</u>

131. The allegations contained in the preceding paragraphs are incorporated by reference as if fully set forth herein. Defendants combined, associated, agreed, mutually understood and concerted together for the purpose of racketeering and willfully and maliciously injuring Plaintiffs in their reputation, trade, business or profession.

132. Plaintiffs were damaged by Defendants' actions.

133. Plaintiffs are entitled to recover three-fold damages, costs and attorneys' fees pursuant to Va. Code §18.2-499 and 500.

### JURY DEMAND AND PRAYER FOR JUDGMENT

Plaintiffs hereby demand a TRIAL BY JURY.

WHEREFORE Plaintiffs respectfully request that this Court:

1) enter judgment against each of the Defendants, jointly and severally;

2) award Plaintiffs compensatory and other damages to be shown at trial (for an amount of not less than One Million Two Hundred Thousand Dollars);

3) award Plaintiffs' their attorneys' fees and costs of litigation;

4) award Plaintiffs' treble damages against the Defendants;

5) assess punitive damages to punish the Defendants;

6)   and provide such other and further relief as may be appropriate under

the circumstances of this case.

Respectfully submitted this 6th day of June, 2016.

NEXUS SERVICES, INC., MICHEAL
DONOVAN and RICHARD MOORE
By Counsel

By */s/ André A. Hakes*
André A. Hakes (VSB# 40358)
TUCKER GRIFFIN BARNES, P.C.
307 West Rio Road
Charlottesville, VA 22901
T: (434) 951-0867
F: (434) 951-0884
ahakes@tgblaw.com
Counsel for Plaintiffs