CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

3/23/2018

JULIA C. DUDLEY, CLERK
BY: S/J.Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

NEXUS SERVICES, INC., *et al.*,   )
   )
     Plaintiffs,   )
   )   Civil Action No. 5:16-cv-00035
  v.   )
   )   By: Elizabeth K. Dillon
DONALD LEE MORAN, *et al.*,   )      United States District Judge
   )
     Defendants.   )

**MEMORANDUM OPINION**

The plaintiffs voluntarily dismissed this case after repeatedly seeking leave to amend and after opposing numerous motions to dismiss filed by defendants. Sheriff Donald L. Smith and deputies Donald Lee Moran and Michael Roane (collectively "the Sheriff defendants") have now filed a motion for attorneys' fees, asking that fees be assessed against plaintiffs and plaintiffs' counsel. The motion has been fully briefed and was argued before the court.

As discussed in more detail herein, plaintiffs' lawsuit included several frivolous claims at the outset, requiring defendants to expend considerable resources reviewing and responding to those claims. The court further concludes that the Sheriff defendants are prevailing parties, having obtained a dismissal that operates as a dismissal with prejudice. Thus, the Sheriff defendants are entitled to fees as a prevailing party against plaintiffs. The court also imposes an award of fees on plaintiffs' attorneys because it finds that they acted in bad faith. Not only did they assert frivolous claims and steadfastly cling to them, but they also unnecessarily complicated and extended this litigation through their conduct. They included numerous irrelevant allegations in every complaint or proposed complaint that they filed and mischaracterized documents upon which they relied. They sought leave to file an amended

complaint mere days before a hearing on the first round of motions to dismiss, even though those motions had been fully ripe for months. Then, at the hearing, and after the court raised questions about the sufficiency of plaintiffs' allegations, they sought additional leave to amend, initially to add "new" allegations against two individual defendants and then expanding their request to be permitted to add allegations against all defendants. But after the court allowed them to file a new motion to amend, plaintiffs' counsel took a completely different course. Rather than adding "new" allegations against those two defendants, plaintiffs' proposed amended complaint dismissed them from the case and instead simply added allegations against other defendants, some of which were again irrelevant to the claims, and attempted to add a new defendant. In short, the conduct of plaintiffs' counsel extended this case unnecessarily and caused the Sheriff defendants to expend resources unnecessarily.

For these reasons, the court will grant the motion for attorneys' fees, although it will not grant the full amount sought by the Sheriff defendants. It will stay the imposition of the fee award until it has the opportunity to make a final determination of the amount, taking into account any additional fee request by the Sheriff defendants for fees incurred as a result of plaintiffs' opposition to the motion for attorneys' fees. It will also allow plaintiffs' attorneys to present any evidence they desire regarding their ability to pay.[1]

---

[1] The docket lists five counsel of record for plaintiffs. They include Andre Aris Hakes of the law firm Tucker Griffin Barnes PC in Charlottesville, Virginia, and four attorneys from the Atlanta, Georgia firm of Gorby, Peters & Associates, LLC—Amy C.M. Burns, Mary Donne Peters, Michael J. Gorby, and Sarah Michelle Phaff. Ms. Phaff was admitted pro hac vice late in the case, her name does not even appear on many subsequent pleadings, she never appeared at any hearing, and she does not appear to have participated in any great degree in this case. Given the extremely limited nature of her apparent involvement, the court will not impose any fees upon her. *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 546 (4th Cir. 1990) (recognizing the authority of a district court, in awarding fees, to consider factors "such as an attorney's experience and whether the attorney entered the case at an advanced stage"). Mr. Gorby, however, was present at the last hearing on the motion for attorneys' fees in June 2017, and his name appears on many, if not all, of the filings in this case, as do the names of Ms. Burns, Ms. Peters, and Ms. Hakes. The latter three were present at all three in-person hearings. Ms. Hakes was local counsel and was not the primary counsel that argued before the court, but her name nonetheless appears on the pleadings and she was present at all three hearings before the court. Given their levels of involvement, the court will hold Mr. Gorby, Ms. Burns, Ms. Peters, and Ms. Hakes each responsible for one-fourth of the amount of fees imposed on the attorneys.

# I.  BACKGROUND

Plaintiffs NEXUS Services, Inc. (Nexus) and two of its officers, Micheal Donovan[2] and Richard Moore, initially filed suit in state court against the same defendants named in this federal suit, alleging violations of state law.  (Compl. ¶ 83, Dkt. No. 1; Proposed Am. Compl. ¶ 111, Dkt. No. 77.)[3]  After demurrers were filed there, the plaintiffs nonsuited that case.  (Proposed Am. Compl. ¶ 111 n.6.)  They then filed this lawsuit on June 6, 2016, alleging most of the same facts and including federal and state claims.  Because the court's imposition of fees is intertwined with the factual allegations in this case and their lack of merit, it is necessary to provide a fair amount of background about the plaintiffs' factual allegations, in addition to the procedural history of the case.

According to the original complaint, Nexus is a Virginia corporation with its principal place of business in Augusta County.  Donovan is the President and CEO of Nexus; Moore is its Executive Vice-President.  (*See* Compl. ¶¶ 1–3; Proposed Am. Compl. ¶¶ 9–10.)

The activities at issue in this lawsuit primarily concern Nexus's charitable criminal bonding program, launched in 2015, called "Serve by Nexus," which plaintiffs describe as "the nation's most successful charitable bonding program."  (Compl. ¶ 26; Proposed Am. Compl. ¶ 28.)  The program is a "charitable criminal bonding program designed to secure bonds for any individual who was awaiting a criminal trial in Harrisonburg, Augusta, and Rockingham Counties, who qualified for a bond, but who remained incarcerated because he or she could not afford to post bond."  (Proposed Am. Compl. ¶ 28.)  Based on the facts set forth in the Complaint and incorporated exhibits, it appears that Nexus pays a licensed bail bondsman to post a bond for

---

[2]  In a few documents, including one document on Nexus letterhead, Donovan's first name is spelled Michael.  But most documents use the spelling Micheal.

[3]  The proposed amended complaint under consideration is set forth as part of Dkt. No. 77.  The exhibits thereto are those set forth as part of Dkt. No. 74-1.

incarcerated persons, but Nexus itself pays the bond fees, rather than requiring any payment from the incarcerated person. (*Id.* ¶¶ 35–38 & Ex. A; *see also* Pls.' Post-Hr'g Mem. 7 n.2, Dkt. No. 88.)

Defendant Bourne is a licensed bail bondsman and, according to the allegations in the complaint, is the primary for-profit criminal bondsman in Augusta County. He works as a general agent for several companies. Defendant Deputy Moran used to be employed by Bourne. In addition to Bourne and the Sheriff defendants, the original complaint also included as defendants Wanda Jean Shrewsbury, the Commissioner of Revenue of Augusta County, and Gene R. Ergenbright, one of her employees. As discussed in more detail below, plaintiffs voluntarily dismissed those defendants after the first hearing on motions to dismiss.

In their proposed amended complaint, Donovan and Moore described themselves as "outspoken civil rights leaders, philanthropists[,] and entrepreneurs who live and work in Augusta County." (Proposed Am. Compl. ¶ 21.) Donovan also anchors a radio and television program known as "Breaking Through," which defendants characterize as an infomercial. According to the complaint, the "Breaking Through" program "focuses on: the civil rights of women and minorities, including persons of African or Hispanic descent; the LGBTQ community; and on criticizing the actions of government officials which may amount to misconduct, or abridgement of civil rights." (*Id.* ¶ 24.) In addition to the "Breaking Through" program, which apparently contained some commentary critical of the Sheriff, Nexus also was advertising its charitable bonding program starting at some point in the early part of 2016.

Both the original complaint and the proposed amended complaint included extensive detail about (and attached as exhibits) various documents that plaintiffs obtained through the inadvertent and overbroad response of the Augusta County Attorney, not a party here, to a

Freedom of Information Act (FOIA) request.[4]  The documents included various emails sent to and from Bourne, who expressed concern both about the possible criminality of Nexus's bonding program and about the impact it would have on his bail bonding business.  Based substantially on those documents and on other alleged acts of harassment by the sheriff's deputies against Nexus or its employees,[5] plaintiffs alleged that there was a conspiracy between all the defendants and further alleged that the Sheriff defendants acted in retaliation for Nexus's speech.  Specifically, plaintiffs allege that defendants retaliated against them for plaintiffs' protected speech, *i.e.*, the Breaking Through program and ads for Nexus's charitable bonding program.  Plaintiffs also alleged that defendants' actions were in response to its First Amendment petitioning rights, in filing both the state lawsuit and this lawsuit, given that the alleged harassment continued after that point.  The only other federal claim alleged was plaintiffs'

---

[4]  Specifically, on April 6, 2016, a Nexus representative sent a FOIA request to the Augusta County Attorney, seeking all communications that referred to Nexus or certain of its principals.  (Proposed Am. Compl. Ex. P.)  On April 22, the County produced documents on a usb drive in response to the request.  According to a letter sent later, though, apparently the "wrong" usb drive was provided.  (*Id.* at Ex. Q.)  On the drive given to Nexus, the County also inadvertently and without authorization provided records of the independent constitutional officers who share computer server space with Augusta County, such as the Sheriff.  These included confidential tax records from the Office of the Tax Commissioner, documents that are prohibited from disclosure by statute, as well as other documents including intelligence reports for the Virginia State Police fusion center, criminal investigation reports, and identifiable information for individuals housed in the Middle River Regional Jail.  (Proposed Am. Compl. ¶ 106 & Ex. Q.)  After discovering the information, Nexus, through counsel, turned it over to the United States Attorneys' Office in Roanoke on April 30, 2016.  The U.S. Attorneys' Office advised that it might notify the local authorities of the overbroad disclosure.  (Proposed Am. Compl. ¶ 107.)

    Thus, this case is somewhat unusual in that plaintiffs had access to thousands of pages of documents from defendants prior to filing suit, most of which they received as part of an erroneously overbroad response by Augusta County, not a party here, to a FOIA request.  Indeed, many of the documents attached as exhibits to their original complaint and their proposed amended complaint are ones plaintiffs received in response to their FOIA request.

[5]  It is worth noting that the "harassment" did not involve any legal action being taken against any plaintiff by any Sheriff defendant.  No tickets or citations were issued, no charges were brought, and neither individual plaintiff was ever arrested or even questioned directly, as far as it is alleged in the complaint.  Instead, the harassment involved supposed threats in conjunction with statements to certain Nexus employees that Nexus should not be investigating law enforcement, frequent drive-bys of Nexus's corporate campus and the Donovan/Moore home, an "aggressive driving incident," and some other alleged incidents.  It is apparently undisputed (and indeed, was alleged in the complaint) that Nexus was under some level of investigation by law enforcement authorities as a result of its charitable bonding program.

allegation that they were seized in violation the Fourth Amendment, during a May 28, 2016 incident.  (*See generally* Proposed Am. Compl. Count I.)

In their original complaint, plaintiffs asserted various claims against different defendants. As noted, the federal claims included Section 1983 claims alleging that all defendants except Bourne violated plaintiffs' First Amendment rights, as already discussed.  Plaintiffs also asserted a Section 1983 claim against the Sheriff defendants premised on an alleged seizure that occurred in May 2016 at Donovan and Moore's home.  State law claims included a common law defamation claim and "insulting words" claim against Bourne, as well as a state civil conspiracy claim against all defendants.  (*See generally* Compl.)

After the lawsuit was filed, the defendants filed motions to dismiss, and the court scheduled a hearing on the motions for October 2016, which was later rescheduled to January 2017.  In September 2016, plaintiffs filed their first motion to amend.  All of the briefing on all motions was completed by October 2016.  Three days before the rescheduled hearing, however, plaintiffs filed a second motion to amend or correct their complaint.

At the January 13, 2017 hearing, the court asked rather pointed questions of plaintiffs' counsel regarding the lack of supporting factual allegations for a number of their claims.  By way of example only, the plaintiffs had made much (in their complaint, in comments to the press, and at the motion to dismiss hearing) about a "Hitler emoji" that appeared in an email between Shrewsbury and Ergenbright.  While any image evoking Hitler obviously can be offensive, the emoji was contained in an internal email between two work colleagues in which, taken in context, one was jokingly calling the other a "meanie" and a taskmaster.  The emails did not pertain to Nexus, nor should they ever have been disclosed to Nexus.  The only reason Nexus had them was due to the improper response to the FOIA request.  There was certainly no

indication that those emails were intended to chill the First Amendment rights (or any other rights) of the plaintiffs, particularly given that they were never intended to be seen by the plaintiffs. The court also questioned repeatedly whether there were allegations showing knowledge on the part of Shrewsbury and Ergenbright about plaintiffs' protected activity and also what allegations showed any connection between Shrewsbury and Ergenbright and the other defendants, so as to support the plaintiffs' conspiracy claim.

In response specifically to the court's questioning about defendant Shrewsbury and Ergenbright, plaintiffs' counsel repeatedly assured the court that there were additional allegations that had not yet been included in their pleading (or in the pleading attached to the second motion to amend, which had been filed three days prior). In large part because of counsel's representation that there were additional allegations that would bolster their claims against Shrewsbury and Ergenbright, the court granted the plaintiffs permission to withdraw their prior motions to amend, and to file a single, omnibus motion for leave to amend. The court thus directed plaintiffs to file a motion for leave to file a third amended complaint by January 30, 2017.

On that date, plaintiffs filed such a motion, but also filed a notice of voluntary dismissal of Shrewsbury and Ergenbright. Effectively, then, the plaintiffs used their deficient claims against Shrewsbury and Ergenbright to request an additional opportunity to seek leave to amend their complaint, but then chose to dismiss those defendants and add additional allegations against the other defendants instead. While the court believes that the voluntary dismissal of the claims against Shrewsbury and Ergenbright was appropriate, it is concerned that counsel was not candid with the court about why it was seeking leave to amend.

The proposed amended complaint filed in January contained additional allegations, omitted others, and modified the claims slightly. The primary changes to the claims were that: (1) the alleged constitutional violations (previously counts I, II, and III) were grouped in a single count, and the statutory basis for them was amended to include 42 U.S.C. § 1988; and (2) the Insulting Words claim against Bourne was dropped.

The third motion to amend and related motions were argued before the court at a hearing on March 2, 2017. Before the court issued its rulings, plaintiffs filed a notice of voluntary dismissal with regard to all remaining claims.[6] Pursuant to Federal Rule of Civil Procedure 41(a)(1)(B), and due to the prior nonsuit of the state court suit, that dismissal operates as a dismissal with prejudice of the plaintiffs' claims.

## II.  DISCUSSION

The Sheriff defendants argue that an award of fees is appropriate on three different grounds. The court addresses each in turn.  It turns first, though, to a discussion and analysis of the strength and procedural history of one of plaintiffs' two federal claims–its Section 1983 claim based on an alleged violation of the Fourth Amendment, which is relevant to the court's analysis. As will be shown, plaintiffs' pursuit of their Fourth Amendment claim is illustrative of the conduct the court believes warrants an award of fees against counsel. As discussed in more detail below, that claim was weak from the outset, but once a video apparently showing the supposed violation was published by plaintiff Donovan, the continued pursuit of that claim was in bad faith. The court does not find the First Amendment claim to be frivolous, although the

---

[6]  At the time of dismissal, there were four motions pending before the court: (1) a motion to dismiss filed by the Sheriff defendants, seeking the dismissal of plaintiffs' original complaint in its entirety on various grounds; (2) a motion to dismiss filed by defendant David Bourne, the bail bondsman; (3) plaintiffs' third motion to amend their complaint; and (4) plaintiffs' motion to strike the sur-reply of defendants.  Although not filed as a separate motion, defendants also requested in their briefing that the court impose sanctions, both against plaintiffs and, pursuant to 28 U.S.C. § 1927, directly against plaintiffs' attorneys.

court believes it lacked factual and legal merit and was subject to dismissal. The court also discusses briefly why the civil conspiracy claim was frivolous.

## A. Claims

### 1. The Section 1983 claim alleging a violation of the Fourth Amendment

In their original complaint, one of plaintiffs' claims (presumably brought only by Moore and Donovan, although both complaints grouped all plaintiffs together as to the Fourth Amendment claim) was a Section 1983 claim based on the supposed seizure of the two men in violation of the Fourth Amendment.

In order to state a Section 1983 claim based on an unreasonable seizure, a plaintiff must establish that he was "seized" for purposes of the Fourth Amendment and that the seizure was without adequate justification. *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 460 (4th Cir. 2013).

The original complaint failed to allege adequately any seizure of Moore and Donovan by anyone, let alone by any named defendant. The complaint merely alleged that, on May 28, 2016, "two uniformed deputies of the August County Sheriff's Office in marked government cars made a rapid approach to the personal residence of Moore and Donovan in tactical formation and blocked the ingress and egress to their residence." (Compl. ¶ 84; Proposed Amended Compl. ¶ 113.) Plaintiffs originally alleged that the deputies blocked the driveway of the residence "so as to prohibit ingress or egress" and thus "prohibited Moore and Donovan from leaving the residence without officer permission" (Compl. ¶ 108), although that allegation was omitted from the proposed amended complaint.

Both the complaint and the proposed amended complaint were scant on the details of this incident. For example, plaintiffs did not specify how long the cars were parked there, or whether

anyone in the home attempted or asked to leave. They appear to allege that the deputies spoke to the plaintiffs' private security guards, stating that "[t]he Deputies advised the Plaintiffs' personal security guards that their visit was simply to determine what type of car Mr. Donovan drove, despite the fact that they had already run the details on his plate information two months earlier in March." (Proposed Am. Compl. ¶ 113.) But there is certainly no allegation of the deputies speaking with Donovan or Moore.

In their proposed amended complaint, plaintiffs added the allegation that Moore and Donovan were present in the home and witnessed the deputies arrive at their home. They also allege that they "perceived the arrangement of police cars as blocking their ability to leave their home, which constituted an unlawful detainment." (*Id.*)

The standard in determining a seizure, however, is not whether plaintiffs thought egress to their home had been blocked by the deputies stopping their cars in a public roadway in front of their home, but whether "in view of all [of] the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Gray*, 883 F.3d 320, 322 (4th Cir. 1989). That standard clearly is not met by plaintiffs' allegations.

In opposition to the motion to dismiss this claim, plaintiffs relied on *United States v. Jones*, 678 F.3d 293 (4th Cir. 2012). That reliance was entirely misplaced, however, because *Jones* is easily distinguishable. In *Jones*, a marked police car turned around to follow the defendant's car and the police proceeded to follow the car for blocks, closely enough to look for traffic violations. Although the police did not observe any traffic violations, when the car pulled into a private driveway, the police parked the cruiser in such a way as to block the defendant's car from leaving the scene. The police officers then "quickly approached Jones by the driver's side of his car." *Id.* at 300, 305. Thus, the court held that the facts "lacked a traditional hallmark

of a police-citizen consensual encounter: the seemingly routine approach of the police officer."

*Id.* at 300 (citation omitted).

Critically, the *Jones* court discussed a number of cases that reached the opposite

conclusion, *i.e.*, that there was no seizure, and it distinguished them from the facts before it.

Those cases are closer to the facts here, although even those cases showed something more akin

to a seizure than what allegedly occurred here. The *Jones* court explained:

> We agree that when an officer blocks a defendant's car from
> leaving the scene, particularly when, as here, the officer has
> followed the car, the officer demonstrates a greater show of
> authority than does an officer who just happens to be on the scene
> and engages a citizen in conversation. For this reason, the three
> cases on which the Government relies are inapposite. *See United
> States v. Thompson*, 546 F.3d 1223 (10th Cir. 2008); *United States
> v. Kim*, 25 F.3d 1426 (9th Cir. 1994); *United States v. Pajari*, 715
> F.2d 1378 (8th Cir. 1983). In those cases, unlike the one at hand,
> the officers did not target and follow the defendant's car before
> blocking it in. The officers here did not merely "come upon an
> already parked car" as they did in *Kim*, 25 F.3d at 1430, or
> approach incognito from behind the defendant's parked car as they
> did in *Pajari*, 715 F.2d at 1380–81. Nor did the police merely ask
> to speak with a pedestrian who happened to be walking toward his
> car, as the officer did in *Thompson*, 546 F.3d at 1224–25. Rather,
> Jones saw the officers follow his car from a public street onto
> private property and then block the car from exiting in their haste
> to speak with him.

*Jones*, 678 F.3d at 302.

Furthermore, although the *Jones* court analyzed the encounter at the point before the

"verbal encounter" began and held that a reasonable driver in Jones's position would not have

felt free to leave, it also stated that it was the "totality of the facts" of the entire encounter that

showed a seizure, rather than a consensual encounter, had occurred. It summarized:

> [T]wo police officers in uniform in a marked police patrol car conspicuously followed Jones from a public street onto private property and blocked Jones's car from leaving the scene. The officers then quickly approached Jones by the driver's side of his car—letting two other vehicle occupants walk away—and nearly immediately asked first that he lift his shirt and then that he consent to a pat down search for weapons. . . . Any one of these facts on its own *might very well be insufficient to transform a consensual encounter into a detention or seizure,* but all of these facts viewed together crystallize into a Fourth Amendment violation."

*Id.* at 305 (emphasis added).

In stark contrast, no Fourth Amendment violation was ever adequately alleged here. Donovan and Moore alleged that they were in their home when the police stopped on a public roadway in front of their driveway. But they did not allege that they had any interaction or discussion at all with the deputies who were blocking their driveway for some unspecified period of time. They did not allege that the deputies turned on any emergency lights on their cars, that weapons were drawn, that the deputies used raised voices, that the deputies touched anyone, or that the deputies made any coercive demands at all. *See, e.g.*, *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 461–62 (4th Cir. 2013) (identifying some of the factors for a court to consider in distinguishing seizures from consensual encounters); *United States v. Weaver*, 282 F.3d 302, 310 (4th Cir. 2002) (same). Plaintiffs also did not allege that they ever attempted or asked for permission to leave their house, that they were ever told they could not, or any facts to support a conclusion that a reasonable person would not have felt free to leave. In short, their allegations are a far cry not only from the facts in *Jones*, but also from all the cases that *Jones* distinguished, which did not find seizures.

The cases relied upon by plaintiffs in their opposition did not overcome the paucity of their allegations, either. Those cases, as is clear even from the explanatory parentheticals plaintiffs included accompanying them, all involved persons physically present in or near cars that were blocked by police cars. (*See* Pls.' Opp'n to Sheriff Defs.' Mot. Dismiss 22–23, Dkt. No. 38.) None of them involved persons in their homes, where the police stopped in front of the driveway and did not even attempt to speak to those persons. Thus, those cases offer no support to plaintiffs at all in their assertion that they were seized. *See also O'Malley v. City of Flint*, 652 F.3d 662, 668–69 (6th Cir. 2011) (holding that a plaintiff, who was out of his vehicle and walking toward his home, was not seized when a police officer parked behind his vehicle in a driveway; noting that "parking behind a vehicle in a driveway does not inherently send a message of seizure because it is how driveways are routinely used"; and distinguishing cases where persons inside of cars were blocked by police cars); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380 (4th Cir. 2009) (holding that no seizure occurred where a uniformed officer approached the plaintiff at his home and asked for a DNA sample but at no point told the plaintiff that he could terminate the encounter).

In addition to the claim failing because there was no allegation that a reasonable person inside Moore and Donovan's home would not have felt free to leave, a Fourth Amendment seizure occurs only if there is a "submission to a show of governmental authority." *United States v. Stover*, 808 F.3d 991, 995–96 (4th Cir. 2015). "'[W]ithout actual submission' to the police, 'there is at most an attempted seizure,' which is not subject to Fourth Amendment protection." *Id.* at 996 (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)); *see also Rutledge v. Town of Chatham*, No. 4:10-cv-35, 2010 WL 4791840, at *5 (W.D. Va. Nov. 18, 2010) (citing *Desyllas v. Bernstine*, 351 F.3d 934, 940 (9th Cir. 2003) as holding that there is no seizure where

the plaintiff "never asked to leave" even though the defendants never told him he could leave), *aff'd*, 414 F. App'x 568 (4th Cir. 2011). Thus, the court easily concludes that this claim was not well-founded from the outset.

A subsequent development in the case, moreover, made patently clear that the claim was not viable and indeed, that it was "frivolous, unreasonable, or groundless," thereby allowing the court to award fees under 42 U.S.C. § 1988. *See Hutchinson v. Staton*, 994 F. 2d 1076, 1080 (4th Cir. 1993) (explaining that prevailing defendants may receive a fee award when "the plaintiff's claim was 'frivolous, unreasonable, or groundless,' or when 'the plaintiff continued to litigate after it clearly became so'") (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)). *See* 42 U.S.C. § 1988. Specifically, defendants provided to the court a copy of a video that Donovan made publicly available by uploading it to YouTube as part of Nexus's "New Year's 2017 Message." The video has a date stamp of May 28, 2016, the same date as the alleged seizure, and shows two sheriff's deputies pulling into a cul-de-sac in front of a home. (*See* Video at 1:11, Dkt. No. 79-2; disc docketed separately as Dkt. No. 81; also accessible at https://www.youtube.com/watch?v=9rdjG34AiYQ&sns=em (last accessed March 23, 2018)).

The camera that is recording appears to be positioned in the dash of a vehicle sitting in what the court presumes is Donovan and Moore's driveway and looking out on the cul-de-sac. For the YouTube video, text has been added at the bottom of the screen that says "Dashcam Video of Augusta Co Deputies Harassing Nexus Employees." There is also a running time-stamp in the video, and the time stamp shows that the cars begin driving down the street at 13:58:56. The video shows one sheriff's deputy pulling into the cul-de-sac as if turning around; another deputy in a separate car pulls up turning the opposite way, and the two cars stop briefly. At no time does either deputy exit either vehicle. The deputy closest to the driveway might have

spoken from his car to someone in the parked car or the two deputies might have spoken to each other; it is not possible to tell from the video. They then drive away. The first time one of the cars was in front of the driveway was at 13:59:02. They begin to pull away at 13:59:34, 32 seconds later, and are out of the cul-de-sac and back up the main portion of the street at 13:59:49. So, the entire time the driveway was blocked, if at all, was 32 seconds, and the cars were present in the cul-de-sac for less than one minute.

No other people appear in the video, which gives a clear view of the entire road constituting the cul-de-sac. The video does not reflect whether there were any occupants in the vehicle equipped with the dash cam, and at no point does it appear that either that vehicle or any other vehicle or person was trying to leave the driveway, or that either deputy attempted to stop anyone from leaving. Furthermore, at no point are the deputies anywhere other than what appears to be a public roadway.

It appears to the court that the incident depicted in the video shows the events on which plaintiffs' Fourth Amendment claim is based, and plaintiffs' counsel never suggested otherwise. Furthermore, defendants provided a copy of that video to plaintiffs' counsel at some point before the hearing on the third motion to amend, and yet plaintiffs' counsel made no attempt at any point to withdraw the Fourth Amendment claim.[7]

---

[7] At the March 3, 2017 hearing before the court, when this issue arose, one of plaintiffs' attorneys, Ms. Peters, simply referred the court to plaintiffs' response to the motion to dismiss and the cases cited therein that she said showed that the "blocking of a home, however brief" constituted a seizure. As already discussed above, however, the cases cited in plaintiffs' response do not involve blocked *homes*, but persons who were physically present *in cars* that were being blocked by police cars. Thus, the court does not believe those cases in any way support the conclusion that the incident depicted in the video, in which two deputies briefly stopped in front of Donovan and Moore's driveway and never exited their vehicles or spoke with Donovan or Moore, constituted a seizure of either man.

### 2. The Section 1983 claim alleging a violation of the First Amendment

Plaintiffs' First Amendment retaliation claim was subject to dismissal because plaintiffs did not adequately allege facts supporting a "causal relationship between [their] protected activity and the defendants' conduct[,]" the third element of such a claim. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). Because the court concludes, however, that the First Amendment claim was not frivolous and does not base any award of fees on the nature of that claim, it does not discuss that claim further.

### 3. The Civil Conspiracy Claim Based on Virginia Code § 18.2-499

In both the complaint and the proposed amended complaint, plaintiffs included a civil conspiracy claim brought under Virginia Code § 18.2-499. The claim was asserted by all plaintiffs against all defendants. "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 337 S.E.2d 744, 748 (Va. 1985) (citations omitted). In order to state a claim, plaintiffs must allege: "(1) concerted action; (2) legal malice; and (3) causally related injury." *Turbomin AB v. Base-X, Inc.*, No. 6:09-cv-7, 2009 WL 1024713, *11–12 (W.D. Va. Apr. 15, 2009) (quoting *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 325 (W.D. Va. 2007), and citing *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 596 (Va. 1984)). "Concerted action" requires a plaintiff to sufficiently allege that the defendant "combined, associated, agreed, mutually undertook, or concerted together" with someone else in the injurious conduct. Va. Code Ann. § 18.2-499; *Simmons v. Miller*, 544 S.E.2d 666, 677 (Va. 2001). A plaintiff must prove that the defendants "combined together to effect a preconceived plan and unity of design and purpose." *Id.* (citations omitted).

A review of the complaint and proposed amended complaint reveals that both contain wholly insufficient allegations to support a civil conspiracy claim. Indeed, the court concludes that the claim was not only inadequately pled, but on balance, the entire claim was frivolous. Rather than go through the many deficits of this claim, the court points to the various defendants' motions to dismiss that addressed it. In short, plaintiffs woefully failed to meet the pleading requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and they relied upon mere conclusory allegations to assert their conspiracy claim. The court notes, in particular, that there were no facts tying all of the defendants together, and nothing other than rank speculation to support an allegation that they all conspired with an improper purpose to harm plaintiffs.

**B.      Legal Bases for Awarding Attorneys' Fees**

The Sheriff defendants seek an award of attorneys' fees on three independent bases, each of which is governed by a different standard and has different requirements that must be met. The three bases are: (1) 28 U.S.C. § 1927, which allows fees to be assessed against a party's attorney, if that attorney has acted improperly in extending the litigation, which requires a finding of "bad faith"; (2) 42 U.S.C. § 1988, which allows fees to defendants here if (a) the defendants are "a prevailing party"; and (b) plaintiffs' claims (or some of them) were "frivolous, unreasonable, or groundless" or "the plaintiff[s] continued to litigate after [they] clearly became so"—both of which plaintiffs challenge; and (3) the court's inherent authority to assess fees or otherwise sanction parties or attorneys who appear before it, which also requires a finding of bad faith. The court discusses each independently.

## 1. 28 U.S.C. § 1927

The first basis the Sheriff defendants offer as supporting an award of fees (assessed against plaintiffs' *attorneys*) is 28 U.S.C. § 1927. That provision provides that if an attorney "so multiplies the proceeding in any case unreasonably and vexatiously," then the court may order that the attorney "satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The attorneys can only be assessed fees to the extent that those fees were caused by their conduct, however. *Fox v. Vice*, 563 U.S. 826, 836 (2011).

The Sheriff defendants argue that the plaintiffs' attorneys should be held responsible because Nexus's claims were legally and factually groundless from the outset and its attorneys "pursue[d] and drag[ged] out the lawsuit through dilatory, unreasonable, and bad faith motions and procedural manipulations, their (often non-responsive) responses to motions and representations at Court hearings, and proceeding with allegations increasingly shown to be fiction by Nexus's own records they put in the public domain, and pursued for the improper purpose of harassing the Defendants." (Dkt. No. 96 at 26–27.) Plaintiffs counter that defendants are not entitled to fees under 28 U.S.C. § 1927 because they cannot establish bad faith on the part of Nexus's attorneys, which is a precondition to imposing fees under § 1927. *E.E.O.C. v. Great Steaks, Inc.*, 667 F.3d 510, 522 (4th Cir. 2012).

As alluded to above, and for the additional reasons the court explains next, the court concludes that defendants' attorneys acted in bad faith and that they unnecessarily or improperly extended the litigation. The court does not believe that all of the claims against all defendants were frivolous from the outset. For example, the court cannot say that the state law defamation claim against Bourne was frivolous. Nonetheless, some claims were clearly meritless, and

furthermore, some of counsel's conduct throughout the litigation demonstrates bad faith.  *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980) ("Bad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.") (citations and internal quotations omitted).

First of all, the court finds that the timing of the second motion to amend, coming three days before a hearing, the subsequent seeking of leave to file a third amended complaint, ostensibly to add allegations that were not available three days prior, and the subsequent voluntary dismissal of Ergenbright and Shrewsbury, are all evidence of bad faith.  These actions by plaintiffs' counsel effectively delayed the resolution of the pending motions to dismiss and required further briefing and a second hearing.

The Fourth Amendment claim, as discussed above, was so woefully inadequate as to be frivolous, given its factual premise.  Worse yet, counsel's actions in continuing to pursue the Fourth Amendment claim after the video surfaced of the supposed seizure (and assuming counsel did not have access to it before then), was in bad faith.   Additionally, the First Amendment claims against Ergenbright and Shrewsbury, which had an inadequate factual basis from the start, unnecessarily prolonged this litigation.

Another action by plaintiffs' counsel also reflects bad faith.  Specifically, in their proposed third amended complaint, and without mentioning at all in their motion that they were attempting to add a party, plaintiffs added "The Office of the Sheriff" as a party, including that entity in the caption of the case and also stating that "[t]he Augusta County Sheriff's Office is a corporate body and a political subdivision of the Commonwealth of Virginia and is a 'person' subject to suit within the meaning of 42 U.S.C. Section 1983."  (Proposed Am. Compl. ¶ 7.)

In response, the Sheriff defendants pointed out the well-settled law that the Office of the Sheriff is not a legal entity and thus not subject to suit such that the proposed amendment would be futile. After the error had been pointed out, plaintiffs' counsel did not acknowledge their carelessness, misunderstanding, or mistake, but instead they claimed that they had not "added" another defendant. They asserted that they had simply included the Office of the Sheriff to make clear that Sheriff Smith was being sued in both his individual and official capacities and that any injunctive relief obtained in his official capacity "would legally also be against the Augusta County Sheriff's Office." They claim there was nothing improper or futile about the "clarification." (Pls.' Reply to Resp. to Third Mot. Leave Amend 6, Dkt. No. 83.) Based on the record before the court, this statement about not adding a party and merely clarifying their pleading, which counsel again repeated at argument, is a misrepresentation: the proposed amended complaint in fact adds the Office of the Sheriff to the caption, adds a paragraph mistakenly stating that the Office of the Sheriff could be sued, and also adds in that plaintiffs are not seeking punitive damages or treble damages against the Office of the Sheriff, but they are seeking compensatory damages and other relief against that entity.

When questioned about this at the hearing, plaintiffs' counsel stated that if the court had "concerns" over the addition, plaintiffs would withdraw the references to the Office of the Sheriff. The court was concerned less about the inclusion of the Office of the Sheriff (which entity could not be added in any event because such amendment would be futile) and more about counsel's failure to ensure that a claim had a reasonable basis in law before filing it, as required by Federal Rule of Civil Procedure 11, and counsel's apparent lack of candor to the court about the purpose of the proposed additions.

The court also notes that the various complaints filed by plaintiffs' counsel often contained repeated allegations that were wholly irrelevant to plaintiffs' claims. These additional allegations resulted in additional expense to every attorney for every defendant that had to review them, respond to them, and otherwise reference them in their motions. By way of example only, all of the proposed complaints contained repeated references to incidents involving racially charged language or to the fact that Donovan and Moore were an openly gay couple, but there was no discrimination claim at all, and so the individual plaintiffs' races, the races or ethnicities of many Nexus clients, and the plaintiffs' sexual orientation were irrelevant. Given that they had no connection to the claims themselves, it appears to the court that many of these allegations were included in pleadings simply as part of an attempt to humiliate or shame the defendants. Such efforts constitute an abuse of the judicial process, and they waste this court's time and the resources of all parties and counsel.

Plaintiffs' complaints also included allegations that misrepresented attached documents or contained conclusions that were so unsupported by—or even contrary to—plaintiffs' other allegations so as to render them implausible. Three examples will suffice to make the point.

First, in its original complaint, Nexus alleged that a letter from the County Attorney (and its delivery by a uniformed sheriff's deputy) was part of defendants' retaliatory conduct, and specifically alleged that the letter had threatened prosecution.[8] (Compl. ¶ 81.) After the January 2017 hearing, during which the court pointed out that the letter did not contain any threat of prosecution, Nexus changed its allegations to state that the letter had "implied" criminal

_____

[8] Clearly upset by that email exchange containing the "Hitler emoji," plaintiffs reacted by having a letter hand-delivered to Commissioner Shrewsbury on May 17, 2016, requesting that the persons involved in the email exchange be fired from their positions and that the Commissioner herself resign. (Compl. Ex. S.) A day later, presumably after the Augusta County Attorney learned about the overbroad disclosure, he had a letter personally delivered to Nexus asking that the usb drive be returned and any copies destroyed. (Proposed Am. Compl. Ex. Q.) Nexus refused, saying it had already handed the drive over to the U.S. Attorney, although it obviously kept copies of the documents, many of which it has utilized in this lawsuit. It contends that it had been instructed "to retain evidence of the improper disclosures by the County" by state police officers. (Proposed Am. Compl. ¶ 109 n.4.)

prosecution.  (Proposed Am. Compl. ¶ 109.)  Even assuming that is true, the letter was sent from the County Attorney, who was not a defendant in this suit.  Furthermore, it is plain from the face of that letter that its purpose was to recover the data that had been disclosed inadvertently.  Thus, plaintiffs' assertion that "the apparent purpose of the May 18, 2016 letter . . . was to continue the campaign of fear and intimidation against Plaintiffs, and to seek to cover up the Defendants' actions and obstruct justice by forcing Plaintiffs to destroy evidence of potential criminal acts committed by County" employees (Compl. ¶ 82; Proposed Am. Compl. ¶ 110) borders on preposterous and is certainly not a reasonable inference to be drawn from other facts alleged or the letter itself.

Second, the original complaint stated that Donovan retained a private security detail because he "[f]ear[ed] for his safety and the safety of his employees as a result of the activities of Deputy Sheriff Moran."  (Compl. ¶ 50 n.4.)  In their proposed amended complaint, plaintiffs allege only that Donovan "retained private security for himself and other Nexus employees because he feared for his safety, the safety of his family, and the safety of the employees of Nexus[,]" but does not attribute that fear directly to Moran's actions.  (*See* Proposed Am. Compl. ¶ 77.)  To the extent plaintiffs allege that Donovan hired private security because he feared that the sheriffs (or Moran, in particular) would do something to him, that is not plausible based on the timing of other allegations in the complaint.  Clearly the private security was retained prior to February 15, 2016, because by that date, Corporal Young had personally visited the home on two occasions to request that the private security guards provide identification.  (*Id.*)  The only interaction alleged in the complaint that occurred prior to that time between any sheriff's deputy and any member of Nexus was when Moran asked two Nexus employees to assist him in an investigation into Nexus.  For Donovan to have thought, based on that single interaction, that his

or his employees' "safety" was so at risk that they needed private security guards makes no sense. The court finds it not at all plausible, then, that the security guards were hired in response to any actions by the defendants.

Third, in their proposed amended complaint, plaintiffs alleged that, in reaction to an episode of "Breaking Through," unidentified persons in the Sheriff's office accessed the driving record of David Briggman, who hosts the program with Donovan. (*Id.* ¶ 78.) They alleged that the access was "not for lawful investigative purposes, but was instead intended to obtain information to assist Defendants in silencing protected free speech which was critical of the Augusta County criminal justice system." (*Id.*) Again, this conclusion is not supported by any factual allegation and is counter-intuitive. The running of a driver's record can hardly be an act intended to chill speech, when drivers are not automatically notified of who has looked at their driving records and can only obtain that information through an affirmative request. In any event, Briggman was not a plaintiff. Again, this exemplifies the conduct of including unrelated and irrelevant allegations in their filings.

While these examples may not pertain to the most critical issues in the case, they are illustrative of a pattern by plaintiffs and their counsel and reflect their willingness to misuse the judicial process or to mislead the court. The court cannot—and will not—blindly look the other way while such conduct occurs. So, it believes at least some fees are warranted as against plaintiffs' attorneys and will discuss the appropriate amount separately.

## 2. 42 U.S.C. § 1988

The court also concludes that an award of fees is appropriate under Section 1988. That provision allows an award of fees to a prevailing party under certain circumstances. Plaintiffs argue that an award under § 1988 is unavailable for two reasons: (1) defendants are not a

prevailing party because a voluntary dismissal is what ended the case, rather than a judgment or consent decree; and (2) a defendant can recover fees only where a plaintiff's case was "frivolous, unreasonable, or without foundation" and the claims here were not.

As already noted above, the court believes that at least some of the plaintiffs' claims were frivolous, unreasonable, or without foundation, or that plaintiffs continued to litigate after the claims "clearly became so." *Hutchinson*, 994 F. 2d at 1080 (a court may award prevailing defendants a fee award when "the plaintiff's claim was 'frivolous, unreasonable, or groundless,' or when 'the plaintiff continued to litigate after it clearly became so'") (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)).  At the very least, this includes the claims against Shrewsbury and Ergenbright, the Fourth Amendment claim, and the vague and sweeping conspiracy claim.  *See id.* at 1081 (instructing the district court to award fees even though the district court had denied the defendants' motions to dismiss, because it warned the plaintiffs "that their conspiracy claim had barely survived dismissal").   So the only question to be answered is whether the Sheriff defendants are a prevailing party, despite the fact that plaintiffs voluntarily dismissed their complaint before the court issued its opinion.  The court concludes that they are a prevailing party.

The Sheriff defendants correctly note that the notice of dismissal here is an "adjudication on the merits," and Federal Rule of Civil Procedure 41(a)(1)(B) so provides.  Plaintiffs appear to agree that a Rule 41(a)(1)(B) dismissal is an adjudication on the merits, but they rely on language from cases saying that a party has prevailed if there has been a "material alteration of the legal relationship of the parties," and there is a "judicial imprimatur on the charge."  *McAfee v. Boczar*, 728 F.3d 81, 88 (4th Cir. 2013) (awarding a fee after a jury verdict).  The primary question, then, is whether a voluntary dismissal that operates as a dismissal with prejudice, as

opposed to a dismissal ordered by a court, can confer "prevailing party" status. Plaintiffs acknowledge that a dismissal with prejudice results in an alteration of the parties' legal status, since the plaintiffs can no longer assert the same claims against the defendants. But they posit that because there is no "judicial imprimatur," on that change, there can be no prevailing party.

The court does not believe that the "judicial imprimatur" language can bear the weight plaintiffs assign it. The language comes from the Supreme Court's decision in *Buckhannon*, which was a case rejecting the so-called "catalyst theory." That is, the *Buckhannon* court held that, even though the plaintiff's lawsuit spurred action outside the lawsuit by someone else and the other action then resulted in the relief the plaintiff wanted, the plaintiff was not a "prevailing party" within the context of the lawsuit. So, in those circumstances, it made sense to include a "judicial imprimatur" requirement. But *Buckhannon* didn't squarely address whether a dismissal with prejudice of the lawsuit would render a defendant a prevailing party.

Two primary cases cited by the parties address at some length this specific issue— whether a voluntary dismissal with prejudice can confer prevailing party status—and they reach opposite conclusions.[9] The first case is *Malibu Media, LLC v. Baiazid*, 152 F. Supp. 3d 496 (E.D. Va. 2015). *Malibu Media* involved a copyright suit brought by a "purveyor of adult films" against an alleged infringer. Ultimately, a joint stipulation of dismissal was filed under Rule 41(a)(1)(A)(ii). While not the same provision as here, the parties' stipulation dismissed the claims with prejudice (and hence with a *res judicata* effect), although defendant reserved the right to seek an award of fees and expenses. The court wrote "so ordered," but only as a matter of administrative significance. The court reasoned that, because that stipulation was effected "by

---

[9] In addition to these two cases, plaintiffs cite to a number of others on page 8 of their memo. (Dkt. No. 97). None of these cases are binding, and several have been abrogated by the Supreme Court's decision in *CRST Van Expedited, Inc. v. EEOC*, 136 S. Ct. 1642 (2016). *See id.* at 1650, 1653 (expressly abrogating *Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842 (8th Cir. 1994)). The remainder are not persuasive for the reasons set forth in the defendant's reply. (Reply Supp. Mot. for Fees 11–13, Dkt. No. 98.)

25

the parties themselves, without judicial involvement," there was no judgment or judicially sanctioned relief, as referenced in *Buckhannon*, to confer prevailing party status. 152 F. Supp. 3d at 500–01.

The contrary result was reached by the court in the Second Circuit's decision in *Carter v. Incorporated Village of Ocean Beach*, 759 F.3d 159 (2d Cir. 2014). In *Carter*, the plaintiffs had voluntarily dismissed some claims with prejudice. They argued that defendants were not a prevailing party as to those claims because it was the plaintiffs' actions, not the court's, that resulted in the dismissal. The Second Circuit rejected that interpretation, calling it "obvious" that a voluntary dismissal with prejudice rendered the defendants prevailing parties. *Id.* at 166. It noted that the defendants' victory was "total" and that plaintiffs were barred by res judicata from relitigation any of the claims: "Because Plaintiffs cannot refile, the judgment has materially altered the parties' legal relationship." *Id.* (citing *Buckhannon*, 532 U.S. at 604); *see also Janik v. Spin Media,* No. 16-7308, 2017 WL 6021644, at *2 (S.D.N.Y. Dec. 4, 2017) (following *Carter* and concluding defendant was prevailing party where plaintiff voluntarily dismissed case with prejudice).

The court agrees with the *Carter* court's interpretation of *Buckhannon*. In the factual context of the *Buckhannon* case, it made sense to require "judicially sanctioned" relief. But where—like here and unlike *Buckhannon*—the change to the parties' relationship occurs in the lawsuit itself and finally and forever disposes of all claims raised in that litigation, there is a judicial imprimatur. Put differently, this court interprets *Buckhannon* as meaning that a "judicial imprimatur" results where the result is achieved through the litigation, not outside of it as in *Buckhannon*.

Thus, the court concludes that the defendants here are prevailing parties, despite the fact that the plaintiffs voluntarily dismissed their claims. *See Carter*, 759 F.3d at 166. *See also Rasmussen v. Thorne*, 2015 WL 4652781 (D. Colo. Aug. 6, 2015) (concluding that a plaintiff's voluntary dismissal with prejudice based on the application of Rule 41(a)(1)(B) was sufficient to render the defendant a "prevailing party" under § 1988). The court will determine the appropriate amount of the fee award separately below.

### 3. Court's Inherent Authority to Award Fees

The Sheriff defendants also urge the court to impose fees on a third basis—the court's inherent authority to assess fees. (Mot. for Attorneys' Fees 29–30 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 38, 45–47, 50 (1991)). The court does not believe it is necessary to award fees under its inherent authority and heeds the warning of the Supreme Court to exercise "caution in invoking its inherent power," and to limit its use of that power generally to circumstances where no other authority would allow it. The court notes, however, that in the event that this court's award of fees under either of the other provisions were to be erroneous, the court would exercise its inherent authority to award the same amount of fees. As already discussed, the court firmly believes that the plaintiffs and their attorneys acted in bad faith in conducting certain aspects of this litigation. Defendants should not be required to bear the costs of responding to frivolous claims and irrelevant allegations or to counter improper and unreasonable arguments.

### 4. Amount of Fees to Be Awarded

In determining the appropriate amount of fees to be assessed, whether under Section 1927 or Section 1988, the court first calculates the lodestar figure by multiplying the number of reasonable hours expended by a reasonable billing rate. *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013), *as amended* (Jan. 23, 2014). In doing so, the court may also adjust the figure based

on the so-called *Johnson* factors, first set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), and adopted in this circuit by *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978).[10] *Id.* at 89–90 (explaining the interplay of the lodestar amount and the *Johnson* factors). Where awarding fees to a defendant, the standard is not based on the degree of success. Instead, the court must be careful to award only fees that were incurred as the proximate cause of either the frivolous claims or plaintiffs' counsel misconduct. *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017); *Fox v. Vice*, 563 U.S. 826, 836 (2011).

Under Section 1927, and as the Supreme Court has recently explained, an attorneys' fee award imposed for the bad faith of the opposing party or counsel must be based on a causal relationship. The court can impose fees only to "redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Goodyear Tire & Rubber Co.*, 137 S. Ct. at 1186 (quoting *Mine Workers v. Bagwell*, 512 U.S. 821, 829 (1994)). Thus, "a sanctioning court must determine which fees were incurred because of, and solely because of, the misconduct at issue (however serious, or concurrent with a lawyer's work, it might have been)." *Id.*

---

[10] The twelve *Johnson* factors are:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*McAfee*, 738 F.3d at 88 n.5.

Similarly, with regard to a fee award under Section 1988, the court has already determined that defendants are a prevailing party and that some of the plaintiffs' claims were frivolous. The Supreme Court has explained that in a case where there are both frivolous and non-frivolous claims, a defendant may recover reasonable attorneys' fees "incurred because of, but only because of, a frivolous claim." *Fox*, 563 U.S. at 836. That is, a defendant "can receive only the portion of his fees that he would not have paid but for the frivolous claim." *Id.* Expenses that the defendant would have incurred even in the absence of the frivolous claims may not be recovered, but any incremental harm attributable to the presence of frivolous claims in the lawsuit is recoverable. *Id.* In making this causal determination, this court need not "achieve auditing perfection." *Id.* at 838. Instead, "[t]he essential goal in shifting fees (to either party) is to do rough justice . . . ." *Id.*

Turning to the fees sought here, the Sheriff defendants argue that the "full amount of defense fees" could be assessed, but explain that they are not actually seeking the entirety of their fees and costs. Instead, the Sheriff defendants are seeking defense fees only for Ms. Johnson, not paralegal or support staff time, and at the rate of $185, which has been her hourly rate since 2010 and is below market rate. They also note that they have pared down the fees actually billed, excluding all time expended in communications with clients and others—except for Nexus's attorneys—even though that time was necessary to the defense. They have also excluded "miscellaneous other fees and expenses" that they contend were appropriately incurred.

In terms of expenses, they are including only mileage in connection with court hearings, and the attorney travel time for those periods were billed at half of the hourly rate. The total amounts sought are $50,576.33. The calculation is set forth in the supporting memorandum and the detailed attorney time record is included in Johnson's declaration. (Mem. Supp. Mot. Att'y

Fees 33, Dkt. No. 96; Johnson Decl., Dkt. No. 96-4.)  They also note in their memorandum that

they are not seeking fees for the state court action, which the court could award under Rule

41(d), and that they are not seeking fees incurred in the preparation of the fee motion, although

they may file a "supplemental fee application for time necessitated by any opposition."  (Dkt.

No. 96 at 37.)[11]

The court recognizes that the Sheriff defendants have already substantially cut fees that

were reasonable and necessary to the defense.  And the court finds that the amount of fees sought

(with one exception noted below) was based on reasonable hours at a reasonable billing rate,

with no adjustments warranted under *Johnson*.  Despite this, the court cannot award the entire

amount of fees sought because the causation standard is not satisfied for all of those fees. That is,

the court cannot say that all of the fees reasonably incurred were the result of misconduct by

plaintiffs' counsel, nor can it say that all of the claims were frivolous or that the entire lawsuit

was brought in bad faith.

Plaintiffs do not challenge the hourly rate, but challenge—in general terms only, but

without alluding to any specifics—the reasonableness of the hours expended.  The court has

reviewed the hours itself and finds only one instance that it believes should not be included as

"reasonably expended."  Specifically, in the briefing on plaintiffs' third motion to amend, there

was an opposition, response, and reply, all of which are permitted under the local rules of this

court.  But then, in response to plaintiffs' reply, the Sheriff defendants filed a document titled as

---

[11]  In their reply, the Sheriff defendants request "the additional fees and expenses necessitated by Nexus' opposition to the motion for fees," although they do not provide an amount of those fees or an itemized listing of the fees incurred.  If they are going to seek any such additional fees, they must provide the itemized listing of the fees within seven days of the entry of the accompanying order.

a "Notice to Correct Nexus Plaintiffs' Further Misrepresentations to the Court." (Dkt. No. 84.)[12]

Plaintiffs then moved to strike that document since it was effectively a sur-reply filed without leave of court in violation of Local Rule 11, which states that, after the filing of a responsive brief and reply brief, "[n]o further briefs (including letter briefs) are to be submitted without first obtaining leave of court." W.D. Va. Civ. R. 11(c). (Pls.' Mot. Strike, Dkt. No. 85.) The Sheriff defendants should have sought leave to file the document before doing so and thus are not entitled to fees spent related to drafting their sur-reply or reviewing the motion to strike. The time entry that includes work on that filing is lumped together with other work, but not divided by separate time entries. Accordingly, the court will not award fees for the 7.0 hour block Ms. Johnson worked on February 28, 2017, that included that work. The court will remove $1,295 in claimed fees from the total amount.

Consistent with the causal requirements discussed above, the court also cannot award the mileage sought by the Sheriff defendants or Ms. Johnson's travel time to the hearings, because, although the hearings themselves were prolonged by plaintiffs' frivolous claims and counsel's bad faith, the Sheriff defendants would have been required to attend the hearings even absent the frivolous claims and plaintiffs' counsel's bad faith. So, that amount—$284.08 for mileage plus $860.25 for travel time, or a total of $1,144.33—is also subtracted from the total, and the court

---

[12] Briefly summarized, the document: (1) responded to plaintiffs' allegations of settlement discussions, stating that there have been none, except a demand letter and a terse response from the Sheriff defendants; (2) responded to plaintiffs' arguments that this is not a strike suit, suggesting that it is a "strike suit" because it is litigation being used for an improper purpose—to keep investigators at arm's length; (3) alleged that plaintiffs have a nefarious purpose in bringing this suit and noted that Nexus is now a defendant in a federal class action lawsuit over its immigration bonding practices; and (4) attached a copy of the class action complaint. (*See* Notice, Dkt. No. 84.)

will not award it.  The remaining amount of fees sought is $48,137. [13]

Turning to which fees are attributable directly to improper actions by plaintiffs' counsel for purposes of the award under Section 1927, the court has already highlighted the misconduct in which it believes plaintiffs' counsel engaged.  The court will require the four attorneys named in note 1 (Hakes, Gorby, Peters, and Burns) to pay 25% of the Sheriff defendants' fees, as revised by the court, for a total of $12,034.25.  This is an imprecise measure, and well may be an underestimate of the extent of their dilatory conduct and the harm it caused defendants.  But the court believes this amount does "rough justice."  *Fox*, 563 U.S. at 838.

As to Section 1988, the court first notes again that one of the two major federal claims against the Sheriff defendants—the Fourth Amendment claim—was frivolous from the outset. [14] Likewise, the state law conspiracy claim was never sufficiently pleaded and was full of conjecture and vague allegations.  As the court has also noted, the claims against Ergenbright and Shrewsbury were also frivolous and, while not brought directly against the Sheriff defendants, those claims were used to prolong the proceeding and obtain the opportunity to file the omnibus motion to amend, which resulted in another round of briefing and caused defendants' counsel to have to review and respond to the newest proposed amended complaint, which contained many frivolous and irrelevant allegations.  While there might have been other non-frivolous state law claims in the lawsuit against other defendants, it is plain that more of the claims against the Sheriff defendants were frivolous than not.  Additionally, the existence of the

---

[13]  There are other time entries that could be omitted on similar grounds under a line-by-line analysis of the claimed fees, such as time spent reviewing emails regarding scheduling matters or motions for extension.  The court does not undertake that analysis, however, in light of its determination to award percentages of the fees sought as an estimate of the caused amounts.  *See, e.g.*, *Fox*, 563 U.S. at 838 ("[T]rial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.").

[14]  The court cannot say that the First Amendment claim was entirely frivolous, although it was subject to dismissal and some aspects of it were frivolous.

frivolous claims both complicated and extended the litigation. On balance, the court believes that the additional fees incurred solely because of the presence of the frivolous claims was approximately 65% of the total fee award, as revised by the court. The court will require plaintiffs to pay the Sheriff defendants' fees in the amount of sixty-five percent of $48,137, which is $31,289.05.

Thus, a total amount of $31,289.05 is awarded, with plaintiffs responsible for the entire amount, and the four attorneys jointly responsible with plaintiffs, each for one-quarter of the total amount of $12,034.25 ($3,008.56 each for Ms. Burns, Ms. Peters, Mr. Gorby, and Ms. Hakes). The court overlaps the two amounts because the fees incurred as a result of plaintiffs' frivolous claims include the same fees and expenses that the court would award against the attorneys. Put differently, the thirty-five percent that is not being awarded is neither the result of frivolous claims nor the result of counsel's misconduct.

### 5. Opportunity to Dispute on Grounds of Inability to Pay

The Fourth Circuit has instructed that, before the court imposes a sanction, it must consider the sanctioned party's ability to pay. *See Salvin v. Am. Nat'l. Ins. Co.*, 281 F. App'x 222, 226 (4th Cir. 2008) ("[i]nability to pay . . . should be treated as reasonably akin to an affirmative defense, with the burden upon the parties being sanctioned to come forward with evidence of their financial status.") (citation omitted). Nexus's statements throughout this litigation regarding its financial condition, as well as a letter from Donovan to Sheriff Smith after the case was dismissed, offering to pay $30,000 to the department "to reimburse documented legal fees or expenses of litigation that were not reimbursed by insurance," (Dkt. No. 96-1), reflect that Nexus has the ability to pay the fees assessed against it.

There is no evidence before the court, however, as to whether any of the attorneys has the ability to pay the proposed fees. Accordingly, after allowing any supplementation by the Sheriff defendants concerning fees incurred to respond to plaintiffs' opposition to the motion for fees, *see supra* note 11, and after the court issues a final amount to be awarded, it will give counsel the opportunity to challenge any award on the ground that he or she cannot afford it. That shall be done not later than 14 days after entry of the court's final determination of the amount of fees. The Sheriff defendants will be entitled to file a response within 7 days of service, and the court will rule on any such objections thereafter.

## III. CONCLUSION

The court does not take the step of imposing these fees lightly and recognizes that, at least in this district, an award of fees on similar grounds is not a common occurrence. But for all the reasons discussed, the court is convinced that the conduct of plaintiffs and their counsel suffices to meet the standards for awarding such fees and that it is appropriate to allow the Sheriff defendants to recover them. Accordingly, the court will grant the Sheriff defendants' motion for an award of fees and will award at least the amounts set forth above.

If the Sheriff defendants want to seek additional fees incurred as a result of the opposition to the fee petition, they should submit an itemization of those additional fees not later than seven days after entry of the accompanying order. If they do not intend to seek any additional fees, they should so advise the court. After the court determines a final amount of fees, taking into consideration any request for those additional fees, it will then allow an opportunity for the

attorneys to challenge the final award of fees based on an inability to pay as discussed above.

An appropriate order will be entered.

Entered: March 23, 2018.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge